CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
5/10/2019
JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| FAITH HAMMER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 6:19CV00027 |
| ) | |
| JOHNSON SENIOR CENTER, INC., ) | |
| JAMES M. DOLAN, ) | |
| MELESSA DOLAN, ) | |
| and ) | |
| ASHLEY CANIPE, ) | |
| ) | |
| Defendants. ) | |

Serve: Johnson Senior Center, Inc.,
    Serve: James M. Dolan, Registered Agent
        115 Senior St.
        Amherst, Virginia 24521

Serve: James M. Dolan
      c/o Johnson Senior Center, Inc.
      115 Senior St.
      Amherst, Virginia 24521

Serve: Melessa Dolan
      c/o Johnson Senior Center, Inc.
      115 Senior St.
      Amherst, Virginia 24521

Serve: Ashley Canipe
      c/o Johnson Senior Center, Inc.
      115 Senior St.
      Amherst, Virginia 24521

# COMPLAINT

## Jurisdiction and Venue

1. This is an action for violations of Section 501 of the Employee Retirement Security Income Act of 1974 ("ERISA"), failure to provide notice of Plaintiff's right to continued health care coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), and violations of state law claims for conversion and breach of fiduciary duty. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367; 28 U.S.C. §§ 2201-2202; 29 U.S.C. § 1332(e), and other applicable law.

2. Venue under 28 U.S.C. § 1391(b) is proper in the Western District of Virginia, where plaintiff resides and worked as an employee of the defendant and where her cause of action under ERISA and COBRA arose. Venue is further proper under 29 U.S.C. § 1332(e)(2) because the statutory violations at issue took place in this District and Defendant has business operations in this District.

## Parties

3. Plaintiff, Faith Hammer ("Hammer"), is a citizen of the United States and a resident of Virginia. Hammer is a former employee of Johnson who was a "covered employee" within the meaning of 29 U.S.C. § 1167(2) and participant in a health care plan called Anthem HealthKeepers ("the Plan") the day before she began a leave of absence on September 21, 2018. The leave of absence was a "qualifying event" within the meaning of 29 U.S.C. § 1163(2), rendering Hammer a "qualified beneficiary" of the Plan pursuant to 29 U.S.C. § 1167(3).

4. Upon information and belief, Defendant Johnson Senior Center, Inc., ("Johnson") is a Virginia corporation doing business in the Western District of Virginia. Johnson operates elderly care facilities in the Counties of Amherst and Nelson, Virginia.

5. At all relevant times Johnson had more than 20 employees within 75 miles of its facility in the County of Amherst, Virginia who were members of the Plan. Johnson in all respects was a Plan sponsor within the meaning of 29 U.S.C. § 1002(16)(B) and its agent was the administrator of the Plan within the meaning of 29 U.S.C. § 1002(16)(A). The Plan provides medical benefits to employees and their beneficiaries and is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1) and a group health plan within the meaning of 29 U.S.C. § 1167(1).

6. Upon information and belief, Defendants James M. Dolan ("Mr. Dolan") and Melessa Dolan ("Mrs. Dolan") were officers and sole shareholders of Johnson at all relevant times and fiduciaries of the Plan as that term is defined in 29 USCS § 1002(21)(A).

7. Upon information and belief, Defendant Ashley Canipe ("Canipe") administered the Plan at all relevant times and was an "administrator" as that term is defined in 29 USCS § 1002(16). Moreover, Canipe was a "fiduciary" as that term is defined in 29 USCS § 1002(21)(A) and a "party in interest" as that term is defined in 29 USCS § 1002(14)(A).

Facts

8. On or about May 2016, Hammer went to work for Johnson on a full time, hourly-wage basis. Hammer cared for elderly residents at Johnson's facility in Amherst, Virginia.

9. Among the benefits that Johnson provided to Hammer was participation in the Plan. The Plan was offered by HealthKeepers, Inc. ("HealthKeepers"), an independent licensee of the Blue Cross and Blue Shield Association. Johnson paid 2/3 of Hammer's insurance premium and deducted the remaining 1/3 from her paycheck. The typical deduction from Hammer's bi-weekly paycheck at all relevant times was seventy dollars ($70.00) for medical insurance and another one

dollar and forty cents ($1.40) for dental insurance. Johnson made the following notation beside each $70 deduction: "125 – Health Insurance (pre-tax)." See Exhibit 1.

10. Johnson agreed to collect the $70.00 and submit it to HealthKeepers along with the remainder of the premium that Johnson agreed to pay on Hammer's behalf.

11. In July 2018, Hammer tested positive during a routine Tuberculosis test. As a result, she received a chest x-ray which detected a spot on her lung.

12. In August 2018, Hammer received a PET scan of her lung which revealed that she had cancer. Hammer returned to work while doctors formulated a plan of action for dealing with the cancer.

13. On August 28, 2018, Hammer was admitted to UVA University Hospital ("UVA") in Charlottesville, Virginia where she received medical treatment including anesthesia and chemotherapy. She was charged a total of $30,268.56 for those services. The Plan paid all but $3,508.21 of those charges. See Exhibit 2.

14. A few days later, Hammer returned to work. Johnson continued deducting $70 per paycheck for health insurance, as before. See Exhibit 3.

15. Unbeknownst to Hammer, Johnson failed to remit payment to HealthKeepers in September 2018 for Hammer's premium under the Plan.

16. On September 11, 2018, received more treatment at UVA. She was charged a total of $2,919.00 for those services. Her coverage was listed as "Anthem" on her statement, but the Plan did not make any payments on her behalf. See Exhibit 4.

17. On or about September 17, 2018, Hammer informed Ashley Canipe, the Administrator of the Plan, that she would need to take a short-term leave of absence to undergo surgery to remove the cancer that was scheduled for September 27. Hammer notified Canipe that

4

September 21 would be her last day of work until she returned from the leave of absence. Canipe granted Hammer's request.

18. Neither Canipe nor any other agent of Johnson provided Hammer with any information related to the Plan when Canipe granted Hammer's requested leave of absence. Specifically, Hammer was not provided with any information that would qualify as a COBRA notice under 29 C.F.R. 2590.606-4(b)(4).

19. On or about September 20, 2018, Hammer reported to UVA for a pre-operation examination. Her doctors determined that her cancer had spread more quickly than previously expected and that her body was too weak to make surgery feasible. Hammer's doctors prescribed additional chemotherapy to shrink the tumor before operating. Hammer was charged a total of $12,275.36 for those services. Her coverage was listed as "Anthem" on her statement, but the Plan did not make any payments on her behalf. See Exhibit 5.

20. On October 11, 2018, Hammer was diagnosed with kidney failure. She was admitted to UVA and presented her insurance card (Exhibit 6) as before. A member of UVA's staff informed Hammer that she did not have insurance coverage. Hammer did not understand how she could not have coverage and showed the staff member her check stubs indicating the deductions for health insurance.

21. Hammer remained at UVA receiving kidney treatment between October 11, 2018 and October 16, 2018, inclusive and incurred a total of $30,442.89 for services she received at UVA during this period. See Exhibit 7.

22. When Hammer was released from UVA, she called Canipe and asked her why the hospital told her that she did not have health insurance. Canipe told her that it was a mix-up with the checks and that it would be taken care of. At least one other employee asked Mrs. Dolan why

5

her health insurance had been cancelled and Mrs. Dolan claimed that Mr. Dolan had failed to submit the required payments. None of the defendants nor any of their officers, agents, employees, or shareholders reported the breach to authorities or took steps to mitigate its effects on the Plan beneficiaries.

23. On November 8, 2018, Hammer received a CT scan at UVA. The total charge for services she received at UVA during this visit was $4,126.00.

24. On November 13, 2018, Hammer received an EKG at UVA. The total charge for services she received at UVA during this visit was $2,439.00.

25. On November 15, 2018, Hammer received additional chemotherapy at UVA. The total charge for services she received at UVA during this visit was $30,800.59.

26. On November 24, 2018, Hammer received a CT scan at UVA. The total charge for services she received at UVA during this visit was $2,671.00.

27. On November 28, 2018, Hammer was seen by a specialist at UVA. The total charge for services she received at UVA during this visit was $470.00.

28. On November 30, 2018, Hammer received an MRI at UVA. The total charge for services she received at UVA during this visit was $491.00.

29. On December 6, 2018, Hammer received additional chemotherapy at UVA. The total charge for services she received at UVA during this visit was $32,002.07.

30. On December 18, 2018, Hammer received treatment at UVA. The total charge for services she received at UVA during this visit was $8.641.76.

31. On January 3, 2019, Hammer received a PET Scan at UVA. The total charge for services she received at UVA during this visit was $10,466.74.

6

32. On January 8, 2019, Hammer returned to UVA for a follow-up appointment. The total charge for services she received at UVA during this visit was $1,829.00.

33. On January 24, 2019, Hammer reported to UVA for cancer surgery. Doctors removed the lower section of her left lung to eliminate the tumor. She remained at UVA until January 31, 2019. The total charge for services she received at UVA during this visit was $142,522.52.

34. On February 19, 2019, Hammer received treatment at UVA. The total charge for services she received at UVA during this visit was $1,516.00

35. On February 21, 2019, Hammer received treatment at UVA. The total charge for services she received at UVA during this visit was $724.00.

36. On March 18, 2019, Hammer received treatment at UVA. The total charge for services she received at UVA during this visit was $2,179.00.

37. Between October 11, 2018 and March 18, 2019, inclusive, Hammer incurred medical bills in excess of $286,000. Because HealthKeepers had terminated Hammer's coverage under the Plan due to Johnson's failure to make Hammer's payments as promised, HealthKeepers did not make any payments on Hammer's behalf related to these expenses.

COUNT I – ERISA Violation of Duty of Loyalty

38. Paragraphs 1 through 37, supra, are incorporated by reference as if restated in their entirety in this Count I.

39. Under 26 USC § 404(a)(1)(A), a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of … providing benefits to participants and their beneficiaries …."

7

Case 6:19-cv-00027-NKM  Document 1  Filed 05/10/19  Page 7 of 16  Pageid#: 7

40. A fiduciary violates 26 USC § 404(a)(1)(A) when he "[d]eliberately favor[s] the corporate treasury when administering" that plan. Cook v. Jones & Jordan Eng'g, Inc., 2009 U.S. Dist. LEXIS 835, *18 (S.D. W. Va. January 7, 2009).

41. Johnson willfully, in bad faith, and in conscious disregard for Hammer's rights, breached its fiduciary duty of loyalty to Hammer when it deliberately failed to remit the premiums to HealthKeepers that it withheld from Hammer's paycheck for that purpose.

42. As a direct and proximate result of Johnson's violations of ERISA and associated regulations, Hammer has sustained medical expenses in excess of $286,000. But for those violations, the Plan would have paid nearly all of those expenses.

43. Under 29 U.S.C. § 1109(a), the defendants, as fiduciaries of the Plan, are "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate …."

## COUNT II – ERISA Violation of Duty of Care

44. Paragraphs 1 through 43, supra, are incorporated by reference as if restated in their entirety in this Count II.

45. Under 26 USC § 404(a)(1)(B), a fiduciary must " discharge his duties . . . with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

8

Case 6:19-cv-00027-NKM   Document 1   Filed 05/10/19   Page 8 of 16   Pageid#: 8

46. A fiduciary violates 26 USC § 404(a)(1)(B) when he "cho[oses] not to segregate employee/participant premium contributions from the company's general assets and intentionally with[olds] said contributions from the Plan." Cook, 2009 U.S. Dist. LEXIS at *19-20.

47. Moreover, "A fiduciary who has failed to pay health insurance premiums and to inform employees of a lapse in their insurance coverage has not acted as a prudent man in like circumstances but rather has violated its duty of care." Id. at *20.

48. Johnson willfully, in bad faith, and in conscious disregard for Hammer's rights, breached its fiduciary duty of care to Hammer when it deliberately chose not to segregate the premium contributions that it withheld from her check and withheld those contributions from the Plan.

49. Johnson further breached its fiduciary duty of care to Hammer when it failed to inform Hammer that her insurance had lapsed due to Johnson's failure to pay premiums on her behalf. Such breach occurred willfully and in bad faith.

50. As a direct and proximate result of Johnson's violations of ERISA and associated regulations, Hammer has sustained medical expenses in excess of $286,000. But for those violations, the Plan would have paid nearly all of those expenses.

51. Under 29 U.S.C. § 1109(a), the defendants, as fiduciaries of the Plan, are "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate …."

9

## COUNT III – ERISA Violation of Fiduciary Duty by Using Plan Assets for Own Benefit

52. Paragraphs 1 through 51, <u>supra</u>, are incorporated by reference as if restated in their entirety in this Count III.

53. Under 26 USC § 404(a)(1)(D), "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

54. Under 29 U.S.C. § 1002(14), a "party in interest" includes "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such plan."

55. Johnson willfully, in bad faith, and in conscious disregard for Hammer's rights, breached its fiduciary duty to Hammer when it used her premium contributions to pay its operating expenses. Moreover, as officers and shareholders of Johnson, Mr. Dolan and Mrs. Dolan personally benefitted from this transaction.

56. As a direct and proximate result of Johnson's violations of ERISA and associated regulations, Hammer has sustained medical expenses in excess of $286,000. But for those violations, the Plan would have paid nearly all of those expenses.

57. Under 29 U.S.C. § 1109(a), the defendants, as fiduciaries of the Plan, are "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate …."

## COUNT IV – ERISA Violation of Failing to Hold Plan Assets in Trust

58. Paragraphs 1 through 57, supra, are incorporated by reference as if restated in their entirety in this Count II.

59. Under ERISA, subject to exceptions which are inapplicable here, "all assets of an employee benefit plan shall be held in trust by one or more trustees." 29 U.S.C. § 1103(a). Those assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1) (emphasis added).

60. Johnson willfully, in bad faith, and in conscious disregard for Hammer's rights, breached its fiduciary duty to hold the funds withheld from Hammer's paycheck in trust when it deliberately chose to use those funds to pay its operating expenses rather than remit them to the Plan as promised.

61. As a direct and proximate result of Johnson's violations of ERISA and associated regulations, Hammer has sustained medical expenses in excess of $286,000. But for those violations, the Plan would have paid nearly all of those expenses.

62. Under 29 U.S.C. § 1109(a), the defendants, as fiduciaries of the Plan, are "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate …."

## COUNT V – ERISA Violation of Co-fiduciary Duty

63. Paragraphs 1 through 62, supra, are incorporated by reference as if restated in their entirety in this Count V.

64. Under ERISA § 405(a),

> In addition to any liability which he may have under any other provisions of this part, <u>a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary</u> with respect to the same plan in the following circumstances:
>
> (1) <u>if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach</u>;
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) <u>if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach</u>.

29 U.S.C. § 1105 (emphasis added).

65. Johnson willfully, in bad faith, and in conscious disregard for Hammer's rights, withheld Hammer's employee premium contributions from the Plan and used those contributions for the benefit of Johnson as well as Mr. Dolan and Mrs. Dolan, personally.

66. In addition, when informed of the missing payments, none of the defendants made reasonable efforts to remedy the conduct.

67. Thus, each defendant fiduciary is jointly and severally liable for the breaches of the other defendant fiduciaries.

## COUNT VI- COBRA Violation

68. Paragraphs 1 through 67, <u>supra</u>, are incorporated by reference as if restated in their entirety in this Count VI.

69. Under 29 U.S.C. § 1166(a)(4)(A), "the administrator [of a Plan] shall notify—in the case of a qualifying event … any qualified beneficiary with respect to such event … of such beneficiary's rights under" COBRA.

12

70. 29 U.S.C. § 1163(2) defines a "qualifying event" to include "[t]he termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment."

71. 29 U.S.C. § 1167(3) defines "qualified beneficiary" to include "a covered employee under a group health plan, any other individual who, on the day before the qualifying event for that employee, is a beneficiary under the plan …."

72. A qualifying event occurred on September 21, 2018 when Hammer's hours were reduced due to the commencement of a long-term leave of absence.

73. Hammer was a qualified beneficiary on that date because she was covered under the Plan the day before that qualifying event.

74. Canipe, the Administrator of the Plan, failed to notify Hammer of her rights to continuing coverage under COBRA.

75. As detailed above, Canipe did not notify Hammer that there would be <u>any</u> change to her health coverage, but to the extent that Canipe had a right to alter Hammer's insurance coverage under the Plan, she failed to notify Hammer that such alteration would occur or that Hammer could continue coverage by paying a larger portion of the premium payments herself.

76. As a direct and proximate result of Canipe's violation of COBRA and associated regulations, Hammer has sustained medical expenses in excess of $286,000. But for those violations, the Plan would have paid nearly all of those expenses.

## COUNT VII- Conversion

77. Paragraphs 1 through 76, <u>supra</u>, are incorporated by reference as if restated in their entirety in this Count VII.

78. At all relevant times, Hammer was the true owner of the funds that were withheld from her paychecks until such time as they were remitted to HealthKeepers on her behalf.

79. The defendants intentionally, maliciously, and in conscious disregard for Hammer's rights, exercised dominion and control over Hammer's property when they failed to remit the funds as promised but chose to use them for their own use instead.

80. In so doing, the defendants permanently deprived Hammer of the use of those funds as intended.

81. As a direct and proximate result of the defendants' violations of Hammer's property rights, Hammer has sustained medical expenses in excess of $286,000. But for those violations, the Plan would have paid nearly all of those expenses.

## COUNT VIII- Breach of Fiduciary Duty

82. Paragraphs 1 through 81, supra, are incorporated by reference as if restated in their entirety in this Count VIII.

83. At all relevant times, the defendants owed fiduciary duties to Hammer to use the money that was withdrawn from her check for the purpose for which it was withdrawn – ie, to remit it to HealthKeepers to pay Hammer's insurance premium.

84. The defendants intentionally, maliciously, and in conscious disregard for Hammer's rights, breached that duty when they failed to remit the funds as promised but chose to use them for their own use instead.

85. As a direct and proximate result of the defendants' violations of Hammer's property rights, Hammer has sustained medical expenses in excess of $286,000. But for those violations, the Plan would have paid nearly all of those expenses.

WHEREFORE, plaintiff, Faith Hammer, respectfully prays that the Court:

A. Declare that Johnson, Mr. Dolan, Mrs. Dolan, and Canipe violated her rights under ERISA.

B. Declare that Johnson and Canipe violated her rights under COBRA;

C. Award her actual damages in an amount not to exceed Three Hundred Thousand and No/100 Dollars ($300,000.00) in the form of wrongfully withheld insurance premiums between September 1, 2018 and September 21, 2018, medical expenses Hammer incurred that the Plan would have paid if Johnson had paid Hammer's premiums with the money it deducted from her paychecks for that purpose, and medical expenses Hammer incurred that the Plan would have paid if Johnson had provided Hammer timely notice as required under COBRA and Hammer had paid those premiums herself (plus prejudgment interest);

D. Award her punitive damages in an amount not to exceed Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00) to punish the defendants for their willful and intentional conversion of Hammer's insurance premium payments and their fraudulent and malicious breach of their fiduciary duty to safeguard those payments and remit them to HealthKeepers on her behalf.

E. Grant her such further monetary, equitable, injunctive and declaratory relief as the Court finds appropriate;

F. Award her attorney's fees, expert witness fees, litigation expenses and costs, all as provided under 29 U.S.C. § 2617(a)(3);

G. Award her prejudgment and post judgment interest on the actual damages, attorney's fees and other sums she recovers; and

H. Mandate that Johnson's management provide and undergo training in the rights and responsibilities of employees and employers under ERISA and COBRA.

FAITH HAMMER

By: s/Paul Beers
      Of Counsel

Paul G. Beers (VSB #26725)
Email: pbeers@glennfeldmann.com
Christopher E. Collins (VSB #90632)
Email: ccollins@glennfeldmann.com
Glenn, Feldmann, Darby & Goodlatte
37 Campbell Avenue, S.W.
P.O. Box 2887
Roanoke, Virginia 24001-2887
Telephone: (540) 224-8000
Facsimile: (540) 224-8050

Jimmie DeWitt Childress, III (VSB # 80220)
Childress Law Firm, PC
767 Village Highway
P.O. Box 936
Rustburg, Virginia 24588
Telephone: (434) 535-4385
Facsimile: (434) 535-4383
Email: jimchildress@childresslawfirmpc.com

Counsel for Faith Hammer