CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
11/30/2020
JULIA C. DUDLEY, CLERK
BY:  s/ CARMEN AMOS
         DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

FAITH HAMMER,

*Plaintiff*,

v.

JOHNSON SENIOR CENTER, INC., *et al.*,

*Defendants.*

CASE NO. 6:19-cv-00027

<u>MEMORANDUM OPINION</u>

JUDGE NORMAN K. MOON

This case involves claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), claims under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), and claims under Virginia common law. Plaintiff, Faith Hammer, filed a Motion for Summary Judgment against Defendants[1] Johnson Senior Center, Inc. ("Johnson"), James Dolan, and Ashley Canipe ("Defendants"). Dkt. 21.

The Court will award Hammer summary judgment on her claims against Johnson and James Dolan as to Counts I, II, and III for their breaches of ERISA's fiduciary duties. However, the Court will deny summary judgment on Hammer's ERISA claims against Johnson and James Dolan as to Counts IV and V. The Court will also deny summary judgment against Canipe as to Counts I through V. Additionally, Hammer's common law conversion and breach of fiduciary duty claims fail as a matter of law because ERISA preempts them (Counts VII and VIII). Finally, Hammer's COBRA violation claim also fails as a matter of law (Count VI).

---

[1] Melessa Dolan is also a Defendant in this case, but Hammer has not moved for summary judgment against her. In this Memorandum Opinion, the Court uses "Defendants" to refer to Johnson, James Dolan, and Canipe only.

I.    **BACKGROUND**[2]

A.    **Johnson's Owners and Employees**

Johnson is a senior care facility in Amherst, Virginia. Dkts. 36 ¶ 4; 22-1 ¶ 4. James Dolan

and Melessa Dolan purchased Johnson in 1999 and were its sole owners. Dkts. 42-2 at 8; 51-2 at

29. James Dolan was an officer and director; he served as Johnson's president. Dkt. 22-5 ¶ 15; *id.*

at 10. Melessa Dolan was an officer and served as vice president, secretary, and treasurer, though

she was primarily responsible for coordinating patient care. Dkt. 42-2 at 9–11, 36–37. After

suffering a heart attack in 2010, James Dolan ceased all involvement in the day-to-day running of

the business until the events described below took place. Dkt. 42-2 at 9. Ashley Canipe, Melessa

Dolan's daughter from a previous marriage, was licensed by the Department of Social Services

("DSS") as Johnson's residential care facility administrator. Dkt. 42-3 at 8. Canipe was responsible

for communicating with DSS and handled human resources matters and general office

management duties. *Id.*   Kathy Massie, a friend of Canipe and Melessa Dolan, also worked in

Johnson's office and assisted with administrative tasks, including paying Johnson's bills. Dkts.

42-1 at 16; 42-2 at 25–26; 42-3 at 15, 29, 31. In 2016, Faith Hammer became a full-time employee

of Johnson. Dkts. 36 ¶ 8; 22-1 ¶ 8.

---

[2] As Defendants James Dolan and Johnson do not oppose Hammer's motion, they leave uncontroverted the facts as Hammer has established them in her motion. *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 409 n.8 (4th Cir. 2010) (stating that "the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion"). In addition, because they failed to respond to the requests for admission, the requests are admitted pursuant to Rule 36(a)(3) of the Federal Rules of Civil Procedure. However, where Canipe has disputed facts, the Court takes them in the light most favorable to her as the nonmoving party. *See Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

**B.**      **Johnson's Group Health Insurance Plan Through Anthem Healthkeepers**

As an employee of Johnson, Hammer participated in the company's health insurance plan,
Anthem HealthKeepers ("the Plan"). Dkts. 36 ¶ 9; 22-1 ¶ 9. The Plan was an employee welfare
benefit plan subject to ERISA's provisions. Dkt. 36 ¶ 5.

Canipe was "listed as administrator for the employees' health insurance with Anthem."
Dkts. 23-1 ¶¶ 1–2; 22-4 ¶ 4 ("During the period 8/15–9/30/18, I was the administrator of the
Plan."). *But see* Dkt. 42-3 at 9 ("Q. Do you know offhand who is actually listed in the plan
description as the plan administrator?" "A. I would speculate that I was probably first the person
listed as the licensed administrator, but . . . I don't know that for sure"). In this role, Canipe
"handled the enrollment forms" for employees to participate in the Plan. *Id.* at 8–9. Anthem call
logs show that Canipe communicated with Anthem in January 2017 to ensure that Anthem had
received Johnson's Plan premium payment for the previous December. Dkt. 51-2 at 2 (noting that
Canipe is "(GRP ADM)").

Johnson deducted $70 from Hammer's biweekly paycheck to cover her portion of the Plan
premium. Dkts. 1-1; 1-3; 22-5 ¶¶ 16–17; 22-6 ¶¶ 8–9. Johnson did not separate the amounts it
deducted from its employees' paychecks to cover the employee's portion of the Plan premiums
from Johnson's general operating account. Dkts. 22-4 ¶ 6; 22-5 ¶¶ 18–19; 22-6 ¶¶ 14. Johnson was
responsible for contributing the remaining two-thirds of the premium and paying the entire Plan
premium to Anthem. Dkts. 36 ¶ 9; 22-1 at 2.

Massie generally paid Johnson's Plan premiums to Anthem. Dkt. 23-1 ¶ 2. She had
discretion to decide the order in which bills were paid and when they should be paid. Dkt. 42-3 at
26–30. Johnson had a 31-day grace period under the Plan, Dkts. 42-4 at 3, 6, and when finances
were "tight," Massie "usually" paid the health insurance premiums "on the last day." Dkts. 23-1 ¶

4; 42-1 at 19–20 (Massie stating that she "generally" paid the premium to Anthem within the grace period, but "a month behind"). Canipe was aware of this practice. Dkts. 23 at 3; 42-1 at 20; 42-3 at 27.

### C.       Hammer's Medical Leave

On September 21, 2018, Hammer began a six-week medical leave of absence from her employment at Johnson, Dkt. 22-4  ¶ 10, after being diagnosed with lung cancer in August 2018, Dkt. 36 ¶ 12. Canipe both approved of Hammer's leave of absence and agreed that Johnson would continue to pay her 50% of her wages during her absence, compensating her for one week out of every two. Dkt. 23-1 ¶ 10.

### D.       James Dolan's Termination of Melessa Dolan's and Canipe's Employment with Johnson

On Monday, October 1, 2018, Melessa Dolan and Kathy Massie appeared at Johnson and encountered James Dolan. Dkts. 42-1 at 21–24; 42-2 at 29–30, 38. Canipe was on vacation. *Id.* James Dolan handed Melessa Dolan a letter terminating Melessa Dolan and Canipe from their employment with Johnson, including their authority to act as agents and/or officers of the company, in a letter prepared by James Dolan's attorney and dated September 27, 2018, the preceding Thursday. Dkts. 22-5 at 7; 23-1 ¶ 1; *id.* at 4; 42-1 at 21–24; 42-2 at 29–30. As of that date, James Dolan assumed operational control of Johnson and had the authority to transact with third parties, including remitting employee premium contributions to the Plan. Dkts. 22-5 ¶¶ 11, 13–14; *id.* at 7 (stating that Johnson "acknowledges and ratifies that James Michael Dolan . . . is authorized to undertake all actions on behalf of the Company . . . ."); 23-1 ¶ 3.

On October 1, when James Dolan gave Melessa Dolan the termination letter, Massie resigned. She told him, "There is a bill that has to be paid today." Dkts. 42-1 at 23–24 (stating that

she did not specifically say "health-insurance bill"); 42-2 at 32; 23-1 ¶ 5; 23-2 ¶ 5. James Dolan

did not respond. *Id.* at 24; Dkt. 22-5 ¶ 23.

      **E.**      **Lapse of Johnson's Anthem Plan and James Dolan's Failure to Reinstate Plan**

Johnson's September Plan premium payment was due September 1, 2018, but Anthem

needed to receive that payment by October 2, 2018, or it would terminate Johnson's coverage as

of that date. Dkt. 42-4 at 3. The total September Plan premium amount was $11,406.53. Dkt. 42-

4 at 4.

Canipe and Massie intended to pay the Plan premium on October 1, 2018, because they

expected Johnson to receive Social Security direct deposit payments into its general operating

account on that date to cover the expense. Dkts. 23-1 ¶ 4; 42 at 17; 42-1 at 19–20; 42-2 at 28, 42-

3 at 25–26. On October 1, 2018, Johnson's Bill Pay account—which was separate from its general

operating account—showed a balance of $38,060.59. Dkts. 42 at 5–6, 17; Dkt. 42-5 at 3. However,

Hammer requested that Johnson and James Dolan admit "that Johnson did not have enough money

in its general operating account to pay the health insurance premiums for Johnson's employees

when they were due by October 1, 2018." Dkts. 22-5 ¶ 20; 22-6 ¶ 12. They did not answer.

Neither Johnson nor any of its agents paid the September bill by the end of the grace period.

Dkts. 23-1 ¶¶ 5–6; 22-5 ¶ 24; 22-6 ¶ 14–15. Hammer requested that Johnson and James Dolan

admit that instead of remitting the healthcare premium amounts deducted from its employees'

paychecks, Johnson used those monies to cover its operating expenses. Dkts. 22-5 ¶ 24; 22-6 ¶¶

13–14. Again, they did not answer.

On October 8, 2018, Anthem sent Canipe and Johnson a letter stating, "Dear Group

Administrator: Our records indicate that the group health insurance premiums to cover 09/01/2018

were not received in accordance with the provisions of your contract. Since the statutory 31-day

grace period afforded under your policy expired 10/02/2018 coverage has been terminated as of that date." Dkt. 51-2 at 1. Consequently, Hammer's insurance coverage was terminated as of October 2, 2018. Dkt. 42-4 at 1, 6.

Anthem call logs show that Anthem communicated with James Dolan about the Plan on October 25, 2018. Dkt. 51-2 at 2. Anthem informed James Dolan that Johnson's group coverage was canceled for nonpayment of the September premium and that Johnson would have to pay a reinstatement fee and e-debit payment by November 9, 2018 to reinstate coverage. *Id.* According to the call logs, James Dolan "SAID 'ACCTS ARE FROZEN'" and "HAS REQ NO OTHER EMPLOYEE OF THE COMPANY IS AUTHORIZED TO MADE [sic] CHANGES TO THE POLICY, INCLUDING ASHLEY CANIPE AND MELESSA DOLAN." *Id.*

Johnson contracted with Life Care Management, Inc., ("LCM") through an agreement that became effective on November 1, 2018. Dkt. 22-5 at 12–15.

### F.     Impact of Johnson's Plan Cancellation on Hammer

On October 11, 2018, Hammer was admitted to UVA Medical Center ("UVA") for kidney failure. Dkt. 36 ¶ 19. Upon presenting her insurance card, Dkt. 1-6, UVA staff informed her that she lacked insurance coverage. *Id.* Between October 11, 2018 and March 18, 2019, Hammer incurred medical expenses in excess of $286,000. *Id.* at ¶ 20, 22–30, 32–37.

Hammer's employment with Johnson terminated on or about January 6, 2019. Dkt. 36 at ¶ 31. Neither Johnson nor its agents informed Hammer that Johnson "failed to pay her health insurance premium" or provided Hammer with a COBRA notice or any other notice that her coverage had terminated at any time. Dkts. 22 at 7–8; 22-4 ¶ 10; 22-5 ¶ 25–26; 22-6 ¶ 16, 19; 36 ¶ 31.

### G.      Procedural Background

Hammer filed her complaint against Defendants, Dkt. 1, before filing this motion for summary judgment against Johnson, Dolan, and Canipe. Dkt. 21. Canipe filed an answer to Hammer's complaint, Dkt. 22-1, and a memorandum in opposition to her motion for summary judgment, Dkt. 23. James Dolan and Johnson filed answers to Hammer's complaint, Dkts. 22-2; 22-3, but they did not file any memoranda in opposition to Hammer's motion for summary judgment, nor did they respond to Hammer's discovery requests or requests for admissions, Dkts. 22-5; 22-6. The Court held a hearing on Hammer's motion for summary judgment. Dkt. 27.

Pursuant to an Order entered by Judge Ballou, Dkt. 35, Hammer filed an amended complaint, Dkt. 36, and Canipe filed a supplemental brief in response to Hammer's motion for summary judgment to which Canipe attached new exhibits, including depositions conducted following the prior hearing. Dkt. 42. Without requesting the Court's leave to do so, Hammer filed her own supplemental brief in support of her motion for summary judgment against Canipe, incorporating these additional exhibits. Dkt. 51.

## II.      STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The nonmoving party must "show that there is a genuine dispute of material fact . . . by offering sufficient proof in the form of admissible evidence." *Id*. (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). The district court must "view the evidence in the light most favorable to the nonmoving party" and

"refrain from weighing the evidence or making credibility determinations." *Id.* "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

The moving party bears the burden of proving that judgment on the pleadings is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, then the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, the party must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant. *Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

The Court must also review an unopposed motion for summary judgment in accordance with Federal Rule of Civil Procedure 56(a). *See Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 380 (4th Cir. 2013); *Choice Hotels Int'l, Inc. v. A Royal Touch Hosp., LLC (NC)*, 409 F. Supp. 3d 559, 564 (W.D. Va. 2019) (Dillon, J.). As the Fourth Circuit has stated,

> Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the district court must still proceed with the facts it has before it and determine whether the moving party is entitled to judgment as a matter of law on those uncontroverted facts.

*Robinson*, 599 F.3d at 409 n.8 (internal quotations omitted).

## III.  HAMMER'S ERISA CLAIMS

Hammer claims that Johnson, James Dolan, and Canipe breached ERISA's fiduciary duties under two theories: first, by failing to segregate Plan assets, and second, by failing to remit Plan

assets to Anthem. Dkt. 36 ¶¶ 1, 38–67. Hammer contends that these actions support claims for the following ERISA violations against Johnson, Dolan, and Canipe: violations of ERISA's duty of loyalty, pursuant to 29 U.S.C. § 1104(a)(1)(A) (Count I); violations of ERISA's duty of care, pursuant to 29 U.S.C. § 1104(a)(1)(B) (Count II); violations of ERISA's fiduciary duty to not use plan assets for personal benefit, pursuant to 29 U.S.C. § 1106(a)(1)(D) (Count III); violations of ERISA's requirement to hold plan assets in trust, pursuant to 29 U.S.C. § 1103(c)(1) (Count IV); and violations of ERISA's co-fiduciary duty to take reasonable efforts to remedy offensive conduct of co-fiduciaries, pursuant to 29 U.S.C. § 1105 (Count V). Dkt. 36.

> Under ERISA,
>
> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries . . . shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . . .

29 U.S.C. § 1109(a). ERISA permits a participant or beneficiary of an employee benefit plan subject to ERISA to bring a civil action to obtain "appropriate relief under section 1109 of this title." *Id.* § 1132(a)(2).

ERISA's fiduciary duties are "derived from the common law of trusts." *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S. Ct. 1823, 1828 (2015) (internal citations and quotations omitted); *see Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 275 (4th Cir. 2019). To show a breach of a fiduciary duty under ERISA, a plan participant or beneficiary must first show "that the party charged with the breach" is a fiduciary. *Dawson-Murdock*, 931 F.3d at 275 (quoting *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 60 (4th Cir. 1992)) (internal quotation marks omitted).

The Court's analysis of Hammer's ERISA claims proceeds in two parts. First, the Court considers whether any of the Defendants qualifies as a fiduciary under the Act. For the reasons set out below, the Court concludes that there is no genuine dispute of material fact that Canipe was a named fiduciary of the Plan until her employment was terminated on September 27, 2018; that James Dolan was a fiduciary of the Plan for the purpose of managing the disposition of assets and the administration of the plan after September 27, 2018; and that Johnson was a fiduciary at all relevant times. *See infra* Part III(A).

Second, the Court considers whether any of the Defendants breached fiduciary duties under ERISA. Alleged violations of fiduciary duties include Defendants' failure to remit employee contributions to the Plan and failure to segregate employee contributions to the Plan. The Court concludes that there is no dispute of material fact that James Dolan and Johnson breached fiduciary duties in failing to remit employee contributions to the Plan. The Court also concludes that a genuine dispute of material fact remains with respect to Defendants' failure to segregate employee contributions to the Plan. *See infra* Part III(B).

**A.      Fiduciary Status Under ERISA**

**1.      Named and Functional Fiduciaries**

Courts have an "obligation to liberally construe fiduciary status under ERISA." *Dawson-Murdock*, 931 F.3d at 278. There are two types of fiduciaries under ERISA: "named fiduciaries" and "functional fiduciaries." *Id.* at 275 (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993)); *Custer v. Sweeney*, 89 F.3d 1156, 1161 (4th Cir. 1996).

A "person" is a fiduciary

with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with

respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A); *Dawson-Murdock*, 931 F.3d at 276. ERISA does not limit fiduciary status to individuals but instead uses the word "person" in defining a "fiduciary." 29 U.S.C. § 1002(21)(A). A corporation may be a "person." *See* 29 U.S.C. § 1002(9) (defining "person" to include a corporation).

A named fiduciary is one "named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly." 29 U.S.C. § 1102(a)(2). ERISA requires every plan to "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." *Id.* § 1102(a)(1).

In determining whether an individual is a functional fiduciary, "the threshold question is . . . whether [the defendant] was acting as fiduciary, in that [he was] performing a fiduciary function[] when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000); *see also Custer*, 89 F.3d at 1161 (noting that ERISA fiduciaries include both named fiduciaries  and "any individual[s] who *de facto* perform[] specified discretionary functions with respect to the managements, assets, or administration of a plan"). Thus, just as a plan may have more than one named fiduciary, it may also have more than one functional fiduciary for purposes of ERISA.

The Fourth Circuit has repeatedly referred to a Department of Labor ("DOL") interpretive bulletin published in 1975 in determining whether a person or entity is an ERISA fiduciary. *See* 29 C.F.R. § 2509.75-8; *Dawson-Murdock*, 931 F.3d at 276 (citing *Custer*, 89 F.3d at 1162;

*Coleman*, 969 F.2d at 61–62). The bulletin provides that "a person who performs purely ministerial functions" is not a fiduciary. Such ministerial functions include "appl[ying] . . . rules determining eligibility for participation or benefits," "advising participants of their rights and options under the plan," or "collect[ing] . . . contributions and appl[ying] . . . contributions as provided in the plan"— "within a framework of policies, interpretations, rules, practices and procedures made by other persons. . . ." 29 C.F.R. § 2509.75-8 (D-2). However, some positions "by their very nature require persons who hold them to perform one or more of the functions" described in ERISA's definition of a fiduciary. *Id.* (D-3). For example, a "plan administrator must, by the very nature of his position, have 'discretionary authority or discretionary responsibility in the administration' of the plan" and is therefore a fiduciary. *Id.* A plan participant or beneficiary need not show that "the plan administrator and named fiduciary also satisfies the functional fiduciary test" in making out a fiduciary breach claim. *See Dawson-Murdock*, 931 F.3d at 277–78.

## 2.    Fiduciaries of Johnson's Anthem Plan

### a.    Canipe

Although Hammer asserts that "Canipe is named in the ERISA plan documents as the Administrator," Dkt. 22, Hammer has not submitted as part of the Record either the Plan instrument or any other governing documents,[3] which must specify at least one named fiduciary under ERISA. *See* 29 U.S.C. § 1102(a)(2); *Dawson-Murdock*, 931 F.3d 272 (finding Plan administrator and named fiduciary of Plan in the Summary Plan Description, and noting that this document and the Summary of Benefits "are integral to the ERISA claims" brought in that case);

---

[3] A Summary of Benefits for the selected Anthem Healthkeepers plan for 2017 is included in the Record, but no such document for 2018 is in the Record. Dkt. 42-3 at 83–99. The Summary of Benefits does not specify the Plan Administrator or a named fiduciary.

*see also* Dkt. 42 at 7 ("The plaintiff has not produced the plan documents that would verify who was shown as the Anthem plan administrator . . . .").[4]

Canipe alternately admits and denies that she was the Plan administrator. In her declaration, Canipe states that she was "listed as administrator for the employees' health insurance with Anthem" until she was terminated from her position on September 27, 2018. Dkt. 23-1 ¶¶ 1–2; *see also id.* at 4 (letter from James Dolan terminating Canipe, "[e]ffective as of September 27, 2018"). Responding to Hammer's first set of interrogatories, Canipe answers, "During the period 8/15– 9/30/18, I was the administrator of the Plan." Dkt. 22-4 ¶ 4. In her deposition, Canipe first states, "I administrated [sic] the plan as my HR duties. I handled the enrollment forms." Dkt. 42-3 at 8. Then, in response to a question about "who is actually listed in the plan description as the plan administrator," Canipe states, "I would speculate that I was probably first the person listed as the licensed administrator, but . . . I don't know that for sure. I just administrated [sic] the . . . enrollment forms through . . . the insurance broker and the employees." *Id.* at 9. Canipe argues that because "the health insurance premiums were actually paid each month by employee Kathy Massie, who paid all bills for the company," Dkt. 23-1 ¶ 2, and Massie "had the total discretion to decide the order in which bills were paid and when they should be paid," Dkt. 42-3 at 26–27, Canipe "was not serving as a fiduciary for ERISA purposes in connection with the payments of the Anthem premiums." Dkt. 42 at 8.

---

[4] Indeed, ERISA provides that "[t]he summary plan description shall contain . . . the name and address of the administrator." 29 U.S.C. § 1022(b). In addition, ERISA requires the plan administrator to "furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description . . . within 90 days after he first becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits." 29 U.S.C. § 1024(b)(1)(A); *see also* 29 U.S.C. § 1022(a) ("A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title."). It is not clear why Defendants have failed to make this document available to Plaintiff and to the Court.

Canipe's own admissions and the Plan-related documents in the Record suggest that Canipe was indeed the Plan administrator. Hammer points to a letter from Anthem dated October 8, 2018 addressed to Ashley Canipe with the salutation "Dear Group Administrator." Dkt. 51-2 at 1. The letter states, "Our records indicate that the group health insurance premiums to cover 09/01/2018 were not received in accordance with the provisions of your contract. Since the statutory 31-day grace period afforded under your policy expired 10/02/2018 coverage has been terminated as of that date." *Id.*[5] Hammer also produces Anthem call logs that show that Canipe communicated with Anthem in January 2017 to ensure that Anthem had received Johnson's premium payment for the previous December. Dkt. 51-2 at 2. In the call log for that communication, Anthem includes a notation after Canipe's name: "(GRP ADM)." *Id.* As Plan administrator, Canipe was automatically a fiduciary, since her position "by [its] very nature" required her to "perform one or more of the functions" of a fiduciary. 29 C.F.R. § 2509.75-8 (D-3).

Canipe argues that she was not a functional fiduciary with respect to managing the disposition of Plan assets because Massie had discretion in determining when to make Plan premium payments to Anthem. Dkt. 42 at 3. This argument fails for two reasons. First, Hammer need not show that Canipe, as "the plan administrator and named fiduciary[,] also satisfies the functional fiduciary test" to make out a fiduciary breach claim against her. *See Dawson-Murdock*, 931 F.3d at 277–78. Second, an employee who performs ministerial tasks such as "collect[ing] . . . contributions and appl[ying] . . . contributions as provided in the plan" "within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary .

---

[5] Of course, this letter is in reference to the missed payment in question, and the Parties do not dispute that Canipe was no longer a Johnson employee after September 27, 2018 and thus could not have been a Plan fiduciary on October 8, 2018.

. . ." 29 C.F.R. § 2509.75-8 (D-2). Massie paid Johnson's Plan premiums to Anthem, but she did so with Canipe's awareness and tacit acceptance of the practice of paying the Plan premiums at the end of the grace period. Dkts. 23 at 3 ("Johnson was simply following its practice of waiting to the last day . . . to pay the premiums because a large payment of Social Security money always arrived by direct deposit on the first of each month."); 42-3 at 27. Massie's performance of the ministerial task of paying the Plan premiums does not eliminate or undermine Canipe's status as a Plan fiduciary.

Thus, the Court determines there is no genuine issue of material fact on this record that Canipe was a named fiduciary of the Plan until her employment was terminated on September 27, 2018.

### b.    James Dolan

Hammer does not argue or point to any evidence in the Record showing that James Dolan was a named fiduciary of the Plan, nor that he was a functional fiduciary before September 27, 2018. But Hammer argues that after terminating the employment of Canipe and Melessa Dolan—James Dolan assumed operational control of Johnson. Dkt. 22-5 ¶¶ 11, 13 (requests for admission that James Dolan terminated the employment of Canipe and Melessa Dolan on September 27, 2018, that he had the authority to make payments to third parties after terminating their employment, and that he had operational control of Johnson on October 1, 2018); *id.* at 7 (letter terminating Canipe's and Melessa Dolan's employment with Johnson). In particular, the termination letter states that Johnson "acknowledges and ratifies that James Michael Dolan . . . is authorized to undertake all actions on behalf of the Company . . . ." *Id.* at 7.

Although James Dolan's positions as President and sole Director of Johnson do not "by their very nature" require him to perform as a fiduciary, this undisputed evidence in the Record

shows that he exercised fiduciary discretion with respect to the Plan's administration, management, and assets. In addition, Anthem call logs recording communications between Anthem and Johnson show that Anthem communicated with James Dolan about the Plan on October 25, 2018. Dkt. 51-2 at 2. The call logs indicate that Anthem informed James Dolan that Johnson's group coverage was currently canceled for nonpayment of the September premium and that Johnson would have to pay a reinstatement fee and e-debit payment by November 9, 2018 to reinstate coverage. *Id.* According to the call logs, James Dolan "SAID 'ACCTS ARE FROZEN'" and "HAS REQ NO OTHER EMPLOYEE OF THE COMPANY IS AUTHORIZED TO MADE [sic] CHANGES TO THE POLICY, INCLUDING ASHLEY CANIPE AND MELESSA DOLAN." *Id.*

In asserting to Anthem his exclusive authority to make changes to the Plan, including paying any reinstatement fees or premiums, James Dolan "exercise[d] . . . discretionary authority or discretionary control respecting management of [the] plan" and "exercise[d] . . . authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). *See also Olson v. E.F. Hutton & Co., Inc.*, 957 F.2d 622, 626 (8th Cir. 1992) ("A person who usurps authority over a plan's assets and makes decisions about the use and disposition of those assets should know they are acting as a fiduciary.").

Thus, the Court determines there is no genuine issue of material fact on this record that James Dolan was a fiduciary of the Plan for the purpose of managing the disposition of Plan assets after September 27, 2018.

### c.     Johnson

Because neither the Plan instrument nor any other Plan governing documents is in the Record, the Court cannot determine whether Johnson was a named fiduciary of the Plan. But under

the definition provided in 29 U.S.C. § 1002(21)(A)(i), the Court finds Johnson qualified as a fiduciary because it "exercise[d] any discretionary authority or discretionary control respecting management of [the] plan or exercise[d] any authority or control respecting management or disposition of its assets." Johnson was responsible for remitting withheld employee contributions to the Plan as well as its own contributions to the premium. In addition, as the employer, Johnson had the authority to appoint and remove the Plan administrator. *See Hickman v. Tosco Corp.*, 840 F.2d 564, 566 (8th Cir. 1988) (finding that an employer with the authority to appoint and remove the committee that administered an employee benefits plan was an ERISA fiduciary).

Thus, the Court determines there is no genuine issue of material fact on this record that Johnson was a fiduciary of the Plan for the purpose of managing the disposition of Plan assets at all relevant times.

### B.      Breaches of ERISA Fiduciary Duties

Having concluded the Defendants all acted as beneficiaries under ERISA, the Court turns to whether Defendants breached their fiduciary duties. ERISA imposes duties of loyalty and care, as well as several other obligations drawn from the common law of trusts, on fiduciaries. These fiduciary obligations are "the highest known to the law." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014). 29 U.S.C. § 1109(a) makes ERISA fiduciaries personally liable for breaches of their fiduciary duties or obligations. Breaching fiduciaries must "make good to such plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary," and courts may impose equitable or remedial relief as appropriate, including the fiduciary's removal. *Id.* However, "[n]o fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary." *Id.* § 1109(b).

To evaluate whether fiduciaries breached their fiduciary duties through their use of plan assets, the Court must first determine whether the monies at issue were in fact plan assets. Although the statute itself does not define "plan assets," DOL regulations state that "plan assets" include "amounts . . . that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution or repayment of a participant loan to the plan." 29 C.F.R. § 2510.3-102(a); *see also United States v. Grizzle*, 933 F.2d 943, 947 (11th Cir. 1991) (noting that in 1989, the DOL clarified that "plan assets" under ERISA include employee contributions under an earlier version of this regulation).

Thus, employee premium contributions withheld from employee paychecks constitute plan assets, "even though the contributions have not actually been delivered to the benefit plan." *Grizzle*, 933 F.2d at 947 (finding that employee contributions to employee vacation fund were funds of employee benefit plan within meaning of ERISA section prohibiting embezzlement of such funds, even though employer and president never turned over such contributions to plan).

In contrast, employer contributions made out of general corporate funds are not plan assets until actually paid to the plan. *See Denison*, 804 F. Supp. at 1543 (holding that fiduciaries' "failure to make *employer* contributions to the plan did not breach any of their fiduciary obligations" because those contributions "did not become plan assets" until paid to the plan) (emphasis added).

Thus, for the reasons set out below, the Court concludes that the withheld employee contributions were Plan assets.

### 1.    Failure to Remit Withheld Employee Contributions to the Plan

#### a.    Canipe

Although Hammer argues that Canipe breached her fiduciary duties by failing to pay the premium by September 1, 2018, undisputed evidence in the Record indicates that Anthem

terminated Johnson's policy when the premium payment was not received by October 2, 2018. For example, Hammer's supplemental brief includes as an exhibit a letter from Anthem dated October 8, 2018 and addressed to Canipe stating, "Our records indicate that the group health insurance premiums to cover 09/01/2018 were not received in accordance with the provisions of your contract. *Since the statutory 31-day grace period afforded under your policy expired 10/02/2018 coverage has been terminated as of that date*." Dkt. 51-2 at 1 (emphasis added). Because Canipe's employment was terminated on September 27, 2018, she was not a fiduciary on October 2, 2018, when the Plan premium payment was due, and the Plan lapsed for nonpayment of Johnson's premium. Thus, the Court finds that Canipe did not breach her fiduciary duties with respect to the failure to remit employee contributions to the Plan to Anthem, which occurred after she ceased being a fiduciary. *See* 29 U.S.C. § 1109(b) (prohibiting liability with respect to a breach committed after fiduciary status ended).

### b.    Johnson and James Dolan

The Court finds that Johnson and James Dolan's failure to remit employee contributions to the Plan and use of these Plan assets to pay of Johnson's other operating expenses from Plan assets violated their fiduciary duties of loyalty and care under 29 U.S.C. § 1104(a).

Johnson and James Dolan were Plan fiduciaries on October 2, 2018, and thus they had a fiduciary duty to use Hammer's withheld premium contributions for her benefit and not the company's benefit. Hammer argues that despite deducting money from Hammer's paychecks to pay the Plan premium due on October 2, 2018, neither Johnson nor James Dolan remitted Hammer's withheld Plan contribution to Anthem by that date. Because Anthem did not receive Johnson's Plan premium payment by that date, Johnson's Plan was cancelled. In addition, Johnson and James Dolan made expenditures from Johnson's general corporate account, which held

19

Hammer's withheld Plan contribution. Hammer contends that these expenditures—such as payment of salaries and other expenses—were transactions that benefited James Dolan and Johnson. Dkt. 22 at 7–8.

ERISA requires a fiduciary's operations with respect to the employee benefits plan to be "solely in the interest of the participants and beneficiaries and for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). *See also Blatt v. Marshall & Lassman*, 812 F.2d 810, 813 (2d Cir. 1987) ("A fiduciary breaches his § 1104 duty to a plan participant by preventing or interfering with the receipt of benefits to which the participant is entitled."). A fiduciary violates his duty of loyalty when the fiduciary "[d]eliberately favor[s] the corporate treasury when administering" the plan. *Cook v. Jones & Jordan Eng'g, Inc.*, No. 5:06-cv-00627, 2009 WL 37376, at *5 (S.D.W.V. Jan. 7, 2009) (quoting *Frahm v. Equitable Life Assur. Soc'y of the U.S.*, 137 F.3d 955, 959 (7th Cir. 1998)) (internal quotation marks omitted) (finding breach of duty of loyalty where corporate fiduciary "commingled [employee health insurance premium] contributions with the general assets of the company" but "did not make premium payments under the Plan," instead "giv[ing] payroll primacy").

Johnson and James Dolan's failure to remit Hammer's withheld Plan premium contribution was not "solely in the interest of [Hammer]," nor did it serve "the exclusive purpose of providing benefits to [Hammer]." 29 U.S.C. § 1104(a)(1)(A). Because Johnson and James Dolan "interfer[ed] with the receipt of benefits to which [Hammer was] entitled," they breached their duty of loyalty under ERISA.

The Court concludes there is no genuine issue of material fact on this record that Johnson and James Dolan are liable for Count I (breach of duty of loyalty).

Furthermore, as to Count II (breach of duty of care), Johnson and James Dolan's conduct did not show the care that a prudent person would take under similar circumstances. Section 1104(a)(1)(B) requires fiduciaries to exercise their obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." The Fourth Circuit has held that the duty of prudence requires fiduciaries to "engage in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity." *Tatum*, 761 F.3d at 358. "A fiduciary who has failed to pay health insurance premiums and to inform employees of a lapse in their insurance coverage has not acted as a prudent man in like circumstances but rather has violated its duty of care." *Cook*, 2009 WL 37376, at *6; *see also Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 471–72 (7th Cir. 1997) (noting that fiduciaries' "failure to pay the health insurance premium payments" and "failure to timely inform employees of the lapse in their insurance coverage" violated duty of care standard despite the "dire financial circumstances" the employer had faced, but ultimately holding that participants and beneficiaries suffered no economic loss and thus no harm because the plan was reinstated and outstanding insurance claims were paid). Here, just as in *Mira* and *Cook*, Johnson and James Dolan failed to pay Plan premiums and failed to timely inform Hammer of the lapse in her coverage under the Plan. Thus, they did not meet the prudent man standard and instead violated their duty of care. And unlike in *Mira*, where the plan participants suffered no economic loss since the plan was reinstated and their claims were paid, Johnson and James Dolan failed to take any action to reinstate the Plan despite opportunities to do so.

Certainly, when a closely held corporation is in acute financial distress, some courts have held that a corporate officer's decision to pay business expenses instead of insurance premiums

constitutes a business decision, not a breach of fiduciary duty. *Local Union 2134, United Mine Workers of Am. v. Powhatan Fuel, Inc.*, 828 F.2d 710, 714 (11th Cir. 1987) (finding, where president of closely held corporation was also ERISA fiduciary, that president's failure to pay health insurance premiums leading to lapse of employees' coverage was not a breach of fiduciary duty because the "decision to pay the business expenses of [the corporation], in an attempt to keep the corporation from financial collapse, was a business decision [he] made in his capacity as president of the corporation," not "in his capacity as fiduciary of the health plan"). But James Dolan and Johnson cannot escape liability simply because Johnson's finances were tight. First, there is no evidence in the record that suggests James Dolan and Johnson made a reasoned business decision not to pay the premiums in order to keep Johnson afloat. Indeed, the record shows that there were sufficient funds in Johnson's Bill Pay account on October 1, 2018 to pay the Plan premium. Dkts. 42 at 5–6, 17; 42-5. Second, *Mira* shows that "dire financial circumstances" do not excuse a breach. 107 F.3d at 471–72.

Additionally, Hammer argues that James Dolan and Johnson breached their duty of care by failing to inform Hammer "that her plan would be cancelled for non-payment." Dkt. 22 at 8. She notes that "[a] fiduciary who has failed to pay health insurance premiums and to inform employees of a lapse in their insurance coverage has not acted as a prudent man in like circumstances but rather has violated its duty of care." *Id.* at 7–8 (quoting *Cook*, 2009 WL 37376, at *6). Indeed, under ERISA, "[i]f there is a modification or change described in section 1022(a) of this title that is a material reduction in covered services or benefits provided under a group health plan (as defined in section 1191b(a)(1) of this title), a summary description of such modification or change shall be furnished to participants and beneficiaries not later than 60 days after the date of the adoption of the modification or change." 29 U.S.C. § 1024(b)(1)(B). *See*

*Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1340 (11th Cir. 1992) ("Providing notice of the discontinuation or suspension of coverage is a fiduciary responsibility; employees are entitled to prompt notice of the suspension of their plan coverage."). Hammer requested that Johnson and James Dolan admit that they did not inform her of their failure to pay the Plan premiums or of the lapse in her health insurance coverage under the Plan. Dkts. 22-5 ¶ 25–26; 22-6 ¶ 16, 19. They did not respond. Therefore, these requests for admission are evidence against them and show their breach of the duty of care.

On this record, the Court determines there is no genuine issue of material fact that Johnson and James Dolan are liable for Count II.

Finally, with respect to Count III (duty to not use plan assets for own benefit), Johnson and James Dolan were parties in interest who benefited from the use of Hammer's withheld Plan premium contribution to cover Johnson's operating expenses in violation of 29 U.S.C. § 1106(a)(1)(D). That subsection bars a fiduciary from engaging in transactions where the fiduciary knows that "such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest." *See Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 573 (1985) (citing 29 U.S.C. § 1106(a)(1) in noting that ERISA "requires that a benefit plan prevent participant employers from gaining even temporary use of assets to which the plan is entitled"). A "party in interest" is "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such plan" as well as "an employer any of whose employees are covered by such plan" and "an owner, direct or indirect, of 50 percent or more of (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation . . . ." 29 U.S.C. § 1002(14). Johnson and James Dolan were parties in interest: not only were they both fiduciaries, but Johnson

was an employer whose employee, Hammer, was covered by the Plan, and James Dolan was a co-owner of Johnson. Dkts. 22-1 ¶ 9; 36 ¶ 9; 42-2 at 8; 51-2 at 29. In addition, Hammer requested that Johnson and James Dolan admit that instead of remitting the healthcare premium amounts deducted from its employees' paychecks, Johnson used those monies to cover its operating expenses. Dkts. 22-5 ¶ 24; 22-6 ¶¶ 13–14. They did not answer. Therefore, that is evidence against them and dispositive of their breach.

The Court determines there is no genuine issue of material fact on this record that Johnson and James Dolan are liable for Count III.

### 2.      Failure to Segregate Plan Assets

Hammer argues that Johnson, James Dolan, and Canipe—when they were respective fiduciaries—breached their fiduciary duties when they failed to set up a separate bank account to hold employee premium contributions and instead held them within Johnson's general operating account. Dkts. 22 at 7–8; 26 at 2–3.

Subject to certain exceptions, all plan assets "shall be held in trust by one or more trustees." 29 U.S.C. § 1103(a). These assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." *Id.* § 1103(c)(1). Although ERISA itself does not require plan assets to be kept in a separate account, DOL regulations state that employee contributions must be segregated—and thus become Plan assets— "as of the earliest date on which such contributions or repayments can reasonably be segregated from the employer's general assets." 29 C.F.R. § 2510.3-102(a). The regulation does not define the term "reasonable time." It states, however, that the time period for segregation for welfare benefit plans shall not exceed ninety days from the date the amount has been withheld from an

employee's paycheck. *Id.* § 2510.3-102(c). For employers who sponsor plans with fewer than 100 participants at the beginning of the plan year, 29 C.F.R. § 2510.3-102(a)(2) sets out a safe harbor provision, stating that amounts will have been segregated within a "reasonable time" so long as they are segregated by the seventh business day following the date of withholding.

In *Bannistor v. Ullman*, a judge in the Fifth Circuit remarked that if withheld employee contributions are commingled in an account holding the company's general assets, "using the plan assets to pay creditors instead of segregating the assets into a separate fund breaches a fiduciary duty because it uses the plan assets for the benefit of the company instead of the benefit of the plan." 287 F.3d 394, 410–11 (5th Cir. 2002) (Garza, J., concurring). Judge Garza's concurring opinion states that

> *deducted amounts are plan assets immediately and they are to be segregated as soon as reasonably possible* . . . . When companies deduct contributions from employee paychecks, those amounts are not loans to the company that it can use for any purpose until the loan becomes due. Those contributions are monies that have already been paid to the employees as compensation. The company is acting merely as a steward; holding the plan participants' property until the assets can be segregated into a separate fund. The company may not dip into the plan assets to use for its own purposes any more than it could dip into the private bank accounts of its employees to fund its shortfalls; once the contributions are withheld, the money no longer belongs to the company.

*Id.* at 410 n.1 (citing 29 C.F.R. § 2510.3-102(a)) (emphasis supplied). *See also Perez v. Wallis*, 77 F. Supp. 3d 730, 743 (N.D. Ill. 2014) (finding that a fiduciary who retained withheld employee health plan contributions in a company's general account and used them to pay operating expenses—including his own salary—violated § 1103(a) and (c) requiring assets to be held in trust and not to inure to the benefit of any employer).

Hammer cites two additional cases in support of this theory. *See Acosta v. Schwab*, No. 5:18-cv-3544, 2019 WL 7046916, at *5 (E.D. Pa. Dec. 20, 2019) (holding on motion for default judgment that "where Plan assets have been commingled with Company funds, the company

ceases operations, and the Plan suffers a significant loss . . . it cannot be said that the Plan assets have been held "for the *exclusive* purposes of providing benefits to participants in the Plan'" (emphasis in original)); *Denison*, 804 F. Supp. at 1452–54 (M.D. Ala. 1992) (holding that segregation of withheld employee contributions is critical "to prevent conflicts between a fiduciary's personal interests and his duty of loyalty to the beneficiary of the trust"). Hammer argues that by waiting to pay the group health insurance premium and covering other operating expenses in the interim, Canipe and James Dolan personally benefited from those Plan assets and "le[ft] Johnson without enough money to cover Hammer's premium." Dkt. 22 at 9. Again, Hammer argues that because withheld employee contributions were not segregated from Johnson's general corporate assets, any expenditures from this account were transactions that benefited Johnson, James Dolan, Melessa Dolan, and Canipe, as parties in interest. Dkts. 22 at 7–8; 26 at 2–5.

The DOL regulations' safe harbor provision for small employers who segregate employee contributions within seven business days applies to Johnson. Dkt. 51 at 6. However, Hammer's withheld employee contributions from August 2018 had been in Johnson's general operating account for thirty-one to forty-five days by October 1, 2018. *Id.* While this is less than the ninety days articulated as the edge of the "reasonable time" definition in the regulations, it is beyond the seven days contemplated in the safe harbor provision. 29 C.F.R. § 2510.3-102(a), (c). Given the absence of the Plan instrument or other governing documents, the Court cannot determine on this record whether the Plan itself required that Plan assets be segregated into a different bank account or held in trust by a certain date.

Canipe makes several arguments contesting Hammer's claims of fiduciary breach for failure to hold Plan assets in trust. First, she argues that she was not obligated to segregate the

withheld employee contributions because ERISA does not require a company to "set up a bank account separate from the company's general operating account to hold money to pay for insurance premiums." Dkt. 23 at 3. ERISA merely requires a company to hold Plan assets in trust, a term which the statute does not define. Canipe also argues that there were no Plan assets in Johnson's accounts until premiums were paid by Johnson to Anthem. Dkt. 42 at 11 (citing *Powhatan Fuel*, 828 F.2d at 714 ("[U]ntil monies were paid by the corporation to the plan there were no assets in the plan under the provisions of ERISA").

But Canipe's argument fails for two reasons. First, although ERISA does not explicitly require sequestering of funds, the accompanying regulations describe a duty to segregate funds within a "reasonable time." 29 C.F.R. § 2510.3-102(a), (c). And second, the regulations—promulgated after *Powhatan Fuel*—make clear that withheld employee contributions are Plan assets subject to this requirement. 29 C.F.R. § 2510.3-102(a), (c); *see also Grizzle*, 933 F.2d at 947 (noting that in 1989, the DOL clarified that "plan assets" under ERISA include employee contributions under an earlier version of this regulation). Thus, the withheld employee contributions become Plan assets after a "reasonable time."

Second, Canipe argues that not segregating the funds did not divert them from the premium payments. Dkts. 23 at 4; 42 at 16–17. The Record supports Canipe's contention that she expected Johnson would use the Social Security funds it was due to receive on October 1 in order to pay its group health insurance premium on that date. Dkts. 23-1 at ¶ 6; 23-2 at ¶ 6. In fact, Canipe includes evidence that Johnson's Bill Pay account had sufficient funds—and certainly at least the amount of employee contributions—on October 1, 2018 to pay the Anthem bill. Dkts. 42 at 5–6, 17; 42-4 at 4; 42-5 at 3.

However, the Court notes that Hammer requested Johnson and James Dolan admit "that

Johnson did not have enough money in its general operating account to pay the health insurance premiums for Johnson's employees when they were due by October 1, 2018." Dkts. 22-5 ¶ 20; 22-6 ¶ 12. They did not answer. Therefore, that is evidence against them.

Third, Canipe argues that Johnson did, in fact, segregate funds because it had both a general operating account into which Social Security deposits were made and a separate Bill Pay account out of which the Anthem premium payment was made. Dkt. 42 at 17. Canipe admits that "Johnson's practice was often to pay the premiums on the first of the month, which was the last day they were due" and the day when the transfers from Social Security were deposited into Johnson's general operating account, to pay the Plan premium to Anthem. Dkt. 23 at 3–4.

But directing the deposit of Social Security funds that Johnson used to pay its portion of the premiums into a bank account separate from its Bill Pay account does not fulfill the requirement to segregate Plan contributions withheld from employee paychecks from other corporate operating assets. *See* Dkt. 41 at 16–17.

Although Canipe's arguments are unconvincing, the Court nonetheless cannot award summary judgment to Hammer on this theory because a genuine dispute remains about a material fact: whether Johnson's group health insurance plan constituted a "cafeteria plan." A cafeteria plan generally is a "written plan under which (A) all participants are employees, and (B) the participants may choose among 2 or more benefits consisting of cash and qualified benefits." 26 U.S.C. § 125(d)(1). Small businesses employing 100 or fewer employees may also establish "simple cafeteria plans" if they meet certain contribution requirements and eligibility and participation requirements. *Id.* § 125(j). *See also* Internal Revenue Service, Publication 15-B, Employer's Tax Guide to Fringe Benefits, 3–5.

The DOL's Technical Release No. 1992-01, Announcement of Revised Enforcement

Policy with Respect to Welfare Plans with Participant Contributions, 57 Fed. Reg. 23272-01 (June 2, 1992) ("DOL Technical Release 92-01"), announced an exception to the trust requirement for "cafeteria plans" under 26 U.S.C. § 125: "the Department will not assert a violation in any enforcement proceeding solely because of a failure to hold participant contributions in trust." This enforcement policy—"expressly limited to ERISA's trust requirements as they apply to cafeteria plans"—was extended until further notice, pursuant to Extension of Enforcement Policy with Respect to Welfare Plans with Participant Contributions, 58 Fed. Reg. 45359-01 (Aug. 27, 1993). The DOL's enforcement view is entitled to *Skidmore* deference in the Court's application of these regulations to private causes of action. *Skidmore v. Swift & Co*, 323 U.S. 134, 139–40 (1944) ("But the Administrator's policies are made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case . . . . Good administration of the Act and good judicial administration alike require that the standards of public enforcement and those for determining private rights shall be at variance only where justified by very good reasons.").

Of course, the DOL's stance merely suggests that the DOL will not seek to hold fiduciaries liable if the *only* duty they breach is the duty to hold employee contributions in trust, not that it will not hold fiduciaries liable for such a breach if those fiduciaries have breached multiple fiduciary duties under different theories of liability. But the Fourth Circuit has read this language to give cover to fiduciaries who fail to hold employee contributions to cafeteria plans in trust. *Phelps v. C.T. Enterprises*, 194 F. App'x 120, 125 (4th Cir. 2006) (per curiam) (citing ERISA Technical Release 92-01, 57 Fed. Reg. 23272).

In *Phelps*, employees who participated in the health insurance plan had contributions withheld from their weekly paychecks on a pretax basis as part of a cafeteria plan under 26 U.S.C.

§ 125. *Id.* at 123. The withheld employee contributions in *Phelps* were not held in trust or segregated from the employer's general corporate assets. After some time, CT Enterprises, the employer, did not provide sufficient funds to the plan's claim administrator to pay all outstanding claims of participants. *Id.* at 122. The *Phelps* court concluded that "even though the cafeteria plan avoided the trust requirement, there was still a requirement that plan assets, including employee contributions, be used only to benefit the participants, and not as general assets of the company." *Id.* at 124. However, the Fourth Circuit ultimately found that the employer breached no fiduciary duties for two reasons. First, it found no evidence that the employer "appl[ied] the employee contributions to payroll or other general company expenses." *Id.* at 125. Second, the employer appropriately forwarded amounts greater than the sum of the withheld employee contributions to the plan's claim administrator within ninety days, "as soon as practicable[] in light of the extenuating financial situation of the company," and so appropriately segregated those assets within a "reasonable amount of time" under 29 C.F.R. § 2510.3-102. *Id.* at 125. The Fourth Circuit was careful to note that "[w]hile changed financial circumstances [do] not justify the misuse of employee contributions . . . an employer does not breach a fiduciary duty merely because the timing of payments to the plan administrator is altered in the face of an onset of adverse circumstances." *Id.* at 125 n.4.

Although the situation here is similar to the one in *Phelps*, there is one critical difference: whereas it was undisputed in *Phelps* that the employer ultimately remitted all withheld employee contributions to the plan, it is undisputed here that Johnson and James Dolan never remitted any withheld employee contributions to the Plan. Still, without further evidence in the Record as to whether the Plan was a cafeteria plan—and thus whether or not the Plan might benefit from DOL enforcement policy with respect to the trust requirement—the Court cannot determine whether the

Defendants named here breached fiduciary duties for the separate failure to sequester Plan assets. Specifically, although James Dolan and Johnson were fiduciaries ninety days after the employee contributions had been withheld but neither segregated nor paid to the Plan, Canipe ceased to be a fiduciary on September 27, less than ninety days after the employee contributions had been withheld. Thus, whether the Plan was a cafeteria plan is a material fact because it determines whether or not the fiduciaries were exempt from the requirement to segregate withheld employee contributions within a "reasonable time."

A genuine dispute of material fact remains as to whether the Plan was a cafeteria plan. On the one hand, the notation next to the premium deductions on Hammer's pay stubs—"125-Health Insurance (pre-tax)"—suggests that the Plan was a cafeteria plan. *See* Dkt. 1-1. On the other hand, Hammer asserts that Anthem representatives have informed her that Anthem did not "sell" cafeteria plans. Dkt. 59. But a cafeteria plan is not something that a particular health insurance provider sells. Instead, it describes a plan maintained by an employer for employees that meets certain statutory requirements in order to allow employees to receive certain benefits on a pretax basis. As a small employer with fewer than 100 employees, Johnson may have established a simple cafeteria plan as long as it met certain statutory requirements. But no evidence on this question has been presented.

Because there is a genuine dispute of material fact relating to the Defendants' liability for failing to segregate Plan assets, the Court cannot decide the Defendants' liability on this theory. Accordingly, the Court will deny Hammer's motion for summary judgment as to Canipe on Counts I–IV and as to Johnson and James Dolan on Count IV.

### 3. Cofiduciary Liability

Finally, as to Count V, although Hammer does not argue any basis for finding Canipe liable

31

as a co-fiduciary, she asserts that "Johnson is liable as a co-fiduciary for the breaches of duty of

its agents, Canipe and Dolan." Dkt. 22 at 5, 7, 8; *see also* Dkt. 22 at 9 (same language, but with

respect to Canipe only). Hammer also argues that James Dolan is liable as a co-fiduciary because

he failed to pay the group health insurance premium after learning it was due, failed to request an

extension or make any effort to reinstate coverage, and failed to inform Hammer that the Plan had

lapsed. Dkt. 22 at 10.

> With respect to cofiduciary liability, ERISA provides:
>
> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; . . . or
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.
>
> 29 U.S.C. § 1105.

Here, Hammer has not alleged facts that constitute breach of fiduciary duty with respect to

any of the Defendants. First, Hammer has not articulated any theory under which Canipe could be

liable as a cofiduciary. Second, the theory under which Hammer argues James Dolan is liable as a

cofiduciary is the same as the theory under which Hammer argues James Dolan is liable for his

own, primary breach of fiduciary duties. As described above, the Court has already found that

James Dolan and Johnson's failure to remit employee contributions to the Plan and failure to

inform Hammer that the Plan had lapsed constitute breaches of their fiduciary duties. In addition,

the Court has found that Canipe was not a fiduciary when the Plan premium payment was due and

thus did not breach any fiduciary duties by failing to remit employee contributions to Anthem.

Thus, James Dolan and Johnson cannot be liable for "participat[ing] knowingly in" or "ha[ving]

knowledge of" Canipe's alleged failure to pay the Plan premium, as she did not in fact breach any

fiduciary duties based on that theory. And Hammer does not allege that James Dolan and Johnson had knowledge of Canipe's alleged failure to segregate Plan assets—the only potential theory under which Canipe might be held liable for breach of her fiduciary duties.

Because these claims fail as a matter of law, the Court will deny summary judgment as to all Defendants on Count V.

## IV.     HAMMER'S COMMON LAW CLAIMS

Hammer also seeks to hold Johnson, James Dolan, and Canipe liable under state common law claims for conversion (Count VII) and breach of fiduciary duty (Count VIII). Dkt. 36. However, Hammer presents no argument supporting any of these claims in her memoranda in support of her summary judgment motion. *See also* Dkt. 42 at 18 (noting that Canipe does not address Hammer's conversion count because Hammer's motion for summary judgment does not address it).

These claims fail as a matter of law. ERISA's provisions, with few exceptions, "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" governed by ERISA. 29 U.S.C. § 1144(a). ERISA's preemption clause "may be the most expansive express pre-emption provision in any federal statute," preempting all state laws that "stand in some relation to, have bearing or concern on, pertain to, refer to, or bring into association with or connection with an ERISA plan." *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 947 (2016) (Thomas, J., concurring) (quoting BLACK'S LAW DICTIONARY 1158 (5th ed. 1979)) (internal quotations omitted). "A law 'relates to' an employee benefit plan . . . if it has a connection with or reference to such a plan." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983)) (internal quotation marks omitted). A state law may be preempted "even if [it] is not specifically designed to affect

such plans, or the effect is only indirect." *Ingersoll-Rand*, 498 U.S. at 139 (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987)) (holding that a Texas state law cause of action for wrongful termination because of an employer's desire to avoid contributing to or paying benefits under the employee's pension fund relates to an ERISA plan and is preempted).

Hammer's common law conversion and breach of fiduciary duty claims "relate to" an ERISA plan because they involve Hammer's premium contributions to the Plan. Hammer's conversion claim states that "the defendants intentionally, maliciously, and in conscious disregard for Hammer's rights, exercised dominion and control over Hammer's property when they failed to remit the funds as promised but chose to use them for their own use instead." Dkts. 1 ¶ 79; 36 ¶ 81. Her claim for breach of fiduciary duty states that "defendants intentionally, maliciously, and in conscious disregard for Hammer's rights, breached [their] duty when they failed to remit the funds as promised but chose to use them for their own use instead."  Dkts. 1 ¶ 84; 36 ¶ 86. These claims are mere restatements of Hammer's claims under ERISA, cloaked in the language of the common law. Because they "relate to" an ERISA plan, these claims are preempted by ERISA's express preemption clause.

Accordingly, the Court finds that Hammer's common law conversion claim (Count VII) and common law breach of fiduciary duty claim (Count VIII) fail as a matter of law.

## V.     HAMMER'S COBRA CLAIM

Hammer argues that James Dolan and Johnson violated COBRA's requirement that "the administrator notify—in the case of a qualifying event . . . any qualified beneficiary with respect to such event . . . of such beneficiary's rights under" COBRA. 29 U.S.C. § 1166(a)(4)(A); Dkt. 36. A qualified beneficiary includes "a covered employee under a group health plan, any other individual who, on the day before the qualifying event for that employee, is a beneficiary under

the plan . . . ." *Id.* § 1167(3). A qualifying event occurs when a covered employee is terminated for any reason except for "gross misconduct" or her hours are reduced. *Id.* § 1163(2).

It is undisputed that when Hammer's employment with Johnson ended on January 6, 2019, she never received a COBRA notice from Johnson or James Dolan. Dkt. 36 ¶ 12. However, at that point, Johnson employees had not been covered under the Plan for over three months, since the Plan was terminated for nonpayment of the premium on October 2, 2018. Therefore, on the day before Hammer asserts that she was terminated, she was not a beneficiary under the Plan. Thus, she was not a qualified beneficiary at that time and was not entitled to a COBRA continuation coverage notice.

COBRA simply does not cover a situation in which an employer's group health insurance plan lapses because of failure to pay plan premiums. In other words, Anthem's termination of Johnson's Plan on October 2, 2018 was not a qualifying event under COBRA. Indeed, attempting to apply COBRA's "continuation coverage" provisions in this circumstance would lead to nonsensical results. For example, continuation coverage under COBRA "must extend for at least the period beginning on the date of the qualifying event and ending not earlier than the earliest of" several dates, including "[t]he date on which the employer ceases to provide any group health plan to any employee." 29 U.S.C. § 1162(2)(B). If Anthem's termination of Johnson's Plan had been a qualifying event, the continuation coverage that Hammer would have been entitled to obtain under COBRA could have ended on the same date that it began.

This is not to say that Johnson and James Dolan did not owe Hammer any notice that her coverage had been terminated—merely that ERISA, not COBRA, governs such notice. James Dolan and Johnson's failure to inform Hammer that her coverage had lapsed constitutes a further breach of their duty of care—but not a COBRA violation.

Accordingly, the Court finds that Hammer's COBRA claim (Count VI) fails as a matter of law.

## VII.   CONCLUSION

For the foregoing reasons, the Court awards summary judgment against James Dolan and Johnson for breach of their fiduciary duties in failing to remit the Plan premium payment, allowing the Plan to lapse and failing to inform Hammer that her coverage under the Plan had terminated, and for using withheld employee premium contributions for their own benefit (Counts I, II, and III). The Court denies summary judgment against Canipe on Counts I–V and against James Dolan and Johnson on Counts IV and V. Finally, Hammer's COBRA claim (Count VI), common law conversion claim (Count VII), and common law breach of fiduciary duty claim (Count VIII) fail as a matter of law.

An appropriate Order will issue.

The Clerk of Court is hereby directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered this 30th day of November 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE