CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
1/21/2021
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| FAITH HAMMER, *Plaintiff*, v. JOHNSON SENIOR CENTER, INC., *et al.*, *Defendants.* | CASE NO. 6:19-cv-00027  MEMORANDUM OPINION  JUDGE NORMAN K. MOON |

This matter is before the Court on Defendant Melessa Dolan's Motion for Summary Judgment against Plaintiff Faith Hammer. Dkt. 40.

There are genuine issues of material fact regarding whether Melessa Dolan ("Melessa") was an ERISA fiduciary of the Anthem group health insurance plan before September 27, 2018. These factual disputes preclude summary judgment in favor of Melessa on Hammer's ERISA claims. Accordingly, the Court will deny Melessa's motion for summary judgment on Counts I through V. Because ERISA preempts Hammer's state common law conversion and breach of fiduciary duty claims, however, the Court will grant the motion for summary judgment on Counts VII and VIII.[1]

**I.   BACKGROUND**

    **A.   Johnson Senior Center's Owners and Employees**

Johnson Senior Center ("Johnson") is a senior care facility in Amherst, Virginia. Dkts. 36 ¶ 4; 10 ¶ 4. James Dolan ("James") and Melessa purchased Johnson in 1999 and were its sole

---

[1] As Count VI raises a COBRA violation claim against James Dolan and Johnson Senior Center, not Melessa Dolan, the Court does not address Count VI in this opinion.

1

owners. Dkts. 41-2 at 8; 50-2 at 29–31. James was an officer and director; he served as Johnson's president. Dkt. 50-2 at 29–31. Melessa was an officer and served as vice president, secretary, and treasurer, though she was primarily responsible for coordinating patient care given her medical background. Dkt. 41-2 at 9–11, 36–37. Johnson's corporate documents provided that the treasurer "shall sign, make, and endorse in the name of the Corporation, all checks, drafts, warrants and orders for the payment of money, and pay out and dispose of the same and receipt therefor . . . ." Dkt. 50-2 at 28. The treasurer also had "the care and custody of and [was] responsible for all the funds and securities of" Johnson. *Id.* Melessa received a salary and rent payments but did not receive dividends or profits from Johnson. Dkt. 41-2 at 12–13.

After suffering a heart attack in 2010, James ceased all involvement in the day-to-day running of the business until the events described below took place. *Id.* at 9. Ashley Canipe, Melessa's daughter from a previous marriage, was licensed by the Department of Social Services ("DSS") as Johnson's residential care facility administrator. Dkt. 41-3 at 8. Canipe communicated with DSS and handled human resources matters and general office management duties. *Id.* Kathy Massie, a friend of Canipe and Melessa, also worked in Johnson's office and assisted with administrative tasks, including paying Johnson's bills. Dkts. 41-1 at 16; 41-2 at 25–26; 41-3 at 15, 29, 31. In 2016, Faith Hammer became a full-time employee of Johnson. Dkts. 36 ¶ 8; 41-3 at 67.

**B.    Johnson's Group Health Insurance Plan Through Anthem Healthkeepers**

As an employee of Johnson, Hammer participated in the company's health insurance plan, Anthem HealthKeepers ("the Plan"). Dkts. 36 ¶ 9. The Plan was an employee welfare benefit plan subject to ERISA's provisions. Dkt. 36 ¶ 5.

Canipe was Johnson's Plan administrator. Dkt. 41-3 at 101 ("During the period 8/15–9/30/18, I was the administrator of the Plan."). *But see id.* at 9 ("Q. Do you know offhand who is

2

actually listed in the plan description as the plan administrator?" "A. I would speculate that I was probably first the person listed as the licensed administrator, but . . . I don't know that for sure"). In this role, Canipe "handled the enrollment forms" for employees to participate in the Plan. *Id.* at 8–9. Anthem call logs show that Canipe communicated with Anthem in January 2017 to ensure that Anthem had received Johnson's Plan premium payment for the previous December. Dkt. 50-2 at 2 (referring to Canipe as "(GRP ADM)," an abbreviation indicating that she was the group administrator of Johnson's Plan).

Johnson deducted $70 from Hammer's biweekly paycheck to cover her portion of the Plan premium. Dkts. 41-3 at 63–65. Johnson did not separate the amounts it deducted from its employees' paychecks to cover the employees' portion of the Plan premiums from Johnson's general operating account. *Id.* at 101. Johnson was responsible for contributing the remaining two-thirds of the premium and paying the entire Plan premium to Anthem. Dkts. 36 ¶ 9; 10 at 2.

Massie generally was Johnson's employee who made its Plan premium payments to Anthem. Dkt. 41-1 at 19–20; 41-2 at 21. She had discretion to decide the order in which bills were paid and when they should be paid. Dkt. 41-3 at 26–30. Johnson had a 31-day grace period under the Plan. Dkts. 41-4 at 3, 6. Massie "generally" paid a given month's premium to Anthem within the grace period, but "a month behind"—in other words, at the beginning of the following month. Dkt. 41-1 at 19–20.

In her deposition, Massie stated that she "fe[lt] certain that" she "had conversations about" her practice of paying the premium to Anthem at the end of the grace period with both Canipe and Melessa. Dkt. 41-1 at 20. Canipe knew that Massie often paid the premium to Anthem at the end of the grace period. Dkt. 41-3 at 27. However, Melessa insisted that she was not aware of this practice until Hammer filed this lawsuit. Dkt. 41-2 at 27. At the time, however, Melessa knew that

3

Johnson's finances in 2018 were "tight." *Id.* Melessa also knew that Johnson's revenue came primarily in the form of direct deposits from Social Security on the first of every month. *Id.* at 28–29.

### C. Hammer's Medical Leave

After being diagnosed with lung cancer, Hammer began a six-week medical leave of absence from her employment at Johnson on September 21, 2018. Dkts. 41-3 at 19–20, 103; 36 ¶ 12. Canipe approved Hammer's leave of absence and told Hammer that Johnson would continue to pay her 50 percent of her wages during her absence. Dkt. 41-3 at 19–20, 103.

### D. James's Termination of Melessa's and Canipe's Employment with Johnson

On Monday, October 1, 2018, when Canipe was on vacation, Melessa and Massie had an encounter with James, who unexpectedly appeared at Johnson. Dkts. 41-1 at 21–24; 41-2 at 29–30, 38. James handed Melessa a letter terminating her as an officer, employee, and agent of Johnson and terminating Canipe as an employee and agent of Johnson. Dkts. 41-1 at 21–24; 41-2 at 29–30, 38, 99. James's attorney prepared the letter, which was dated Thursday, September 27, 2018. Dkt. 41-2 at 99. There is no dispute that, as of that date, James assumed operational control of Johnson and had the authority to transact with third parties. *Id.* (stating that Johnson "acknowledges and ratifies that James Michael Dolan . . . is authorized to undertake all actions on behalf of the Company . . . .").

On October 1, when James gave Melessa the termination letter, Massie resigned. Melessa overheard Massie tell James that a bill needed to be paid that day. Dkts. 41-1 at 23–24 (stating that she did not specifically say "health-insurance bill"); 41-2 at 32. James did not respond to Massie's statement. Dkt. 41-1 at 24.

4

### E. Lapse of Johnson's Anthem Plan and James's Failure to Reinstate Plan

Johnson's September Plan premium payment was due September 1, 2018, but Anthem needed to receive that payment by October 2, 2018, or it would terminate Johnson's coverage as of that date. Dkt. 41-4 at 3. The total September Plan premium amount was $11,406.53. *Id.* at 4.

Canipe and Massie intended to pay the Plan premium on October 1, 2018, because they expected Johnson to receive Social Security direct deposit payments into its general operating account on that date to cover the expense. Dkts. 41-1 at 19–20; 41-2 at 28, 41-3 at 25–26. On October 1, 2018, Johnson's Bill Pay account—which was separate from its general operating account—showed a balance of $38,060.59. Dkt. 41-5 at 3. No one made Johnson's premium payment to Anthem on October 1 or 2. Dkts. 41-1 at 24; 41-2 at 27.

On October 8, 2018, Anthem sent Canipe and Johnson a letter stating, "Dear Group Administrator: Our records indicate that the group health insurance premiums to cover 09/01/2018 were not received in accordance with the provisions of your contract. Since the statutory 31-day grace period afforded under your policy expired 10/02/2018 coverage has been terminated as of that date." Dkt. 50-2 at 1. Consequently, Anthem terminated the Plan—including Hammer's insurance coverage under the Plan—as of October 2, 2018. Dkt. 41-4 at 1, 6. Melessa also realized that she no longer had health insurance coverage after that date when she unsuccessfully attempted to fill her prescriptions. Dkt. 41-2 at 42–43.

Anthem's call logs show that it communicated with James about the Plan on October 25, 2018. Dkt. 50-2 at 2. Anthem informed James that Johnson's group coverage was canceled for nonpayment of the September premium and that Johnson would have to pay a reinstatement fee and e-debit payment by November 9, 2018 to reinstate coverage. *Id.* According to the call logs, James "SAID 'ACCTS ARE FROZEN'" and "HAS REQ NO OTHER EMPLOYEE OF THE

5

COMPANY IS AUTHORIZED TO MADE [sic] CHANGES TO THE POLICY, INCLUDING ASHLEY CANIPE AND MELESSA DOLAN." *Id.*

Johnson contracted with Life Care Management, Inc. ("LCM") to take over management of the senior care facility through an agreement that became effective on November 1, 2018. Dkt. 41-2 at 114–17.

### F. Impact of Johnson's Plan Cancellation on Hammer

On October 11, 2018, Hammer was admitted to UVA Medical Center ("UVA") for kidney failure. Dkt. 36 ¶ 19. Upon presenting her insurance card, Dkt. 1-6, UVA staff informed her that she lacked insurance coverage. Dkt. 36 ¶ 19. Between October 11, 2018 and March 18, 2019, Hammer incurred medical expenses in excess of $286,000. *Id.* at ¶¶ 20, 22–30, 32–37.

Hammer's employment with Johnson terminated on or about January 6, 2019. Dkt. 36 at ¶ 31.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The nonmoving party must "show that there is a genuine dispute of material fact . . . by offering sufficient proof in the form of admissible evidence." *Id*. (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Id*. "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must

rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

The moving party bears the initial burden of showing there is no genuine dispute of material fact entitling the movant to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, then the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, the party must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant. *Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

The Court must also review an unopposed motion for summary judgment in accordance with Federal Rule of Civil Procedure 56(a). *See Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 380 (4th Cir. 2013); *Choice Hotels Int'l, Inc. v. A Royal Touch Hosp., LLC (NC)*, 409 F. Supp. 3d 559, 564 (W.D. Va. 2019). As the Fourth Circuit has stated,

> Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the district court must still proceed with the facts it has before it and determine whether the moving party is entitled to judgment as a matter of law on those uncontroverted facts.

*Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 409 n.8 (4th Cir. 2010) (internal quotation marks omitted).

### III. HAMMER'S ERISA CLAIMS (COUNTS I–V)

Hammer claims that Melessa breached ERISA's fiduciary duties under two theories: first, by failing to segregate Plan assets, and second, by failing to remit Plan assets to Anthem. Dkt. 36 ¶¶ 1, 38–67. Hammer contends that these actions support claims for the following ERISA

7

violations against Melessa: violations of ERISA's duty of loyalty, pursuant to 29 U.S.C. § 1104(a)(1)(A) (Count I); violations of ERISA's duty of care, pursuant to 29 U.S.C. § 1104(a)(1)(B) (Count II); violations of ERISA's fiduciary duty to not use plan assets for personal benefit, pursuant to 29 U.S.C. § 1106(a)(1)(D) (Count III); violations of ERISA's requirement to hold plan assets in trust, pursuant to 29 U.S.C. § 1103(c)(1) (Count IV); and violations of ERISA's co-fiduciary duty to take reasonable efforts to remedy offensive conduct of co-fiduciaries, pursuant to 29 U.S.C. § 1105 (Count V). Dkt. 36.

> Under ERISA,
>
> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries . . . shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . . .

29 U.S.C. § 1109(a). ERISA permits a participant or beneficiary of an employee benefit plan subject to ERISA to bring a civil action to obtain "appropriate relief under section 1109 of this title." *Id.* § 1132(a)(2).

ERISA's fiduciary duties "derive[] from the common law of trusts." *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S. Ct. 1823, 1828 (2015) (internal citations and quotation marks omitted); *see Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 275 (4th Cir. 2019). To establish a breach of a fiduciary duty under ERISA, a plan participant or beneficiary must first show "that the party charged with the breach" is a fiduciary. *Dawson-Murdock*, 931 F.3d at 275 (quoting *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 60 (4th Cir. 1992)) (internal quotation marks omitted).

### A. Fiduciary Status Under ERISA

Courts have an "obligation to liberally construe fiduciary status under ERISA." *Dawson-Murdock*, 931 F.3d at 278. There are two types of fiduciaries under ERISA: "named fiduciaries" and "functional fiduciaries." *Id.* at 275 (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993)); *Custer v. Sweeney*, 89 F.3d 1156, 1161 (4th Cir. 1996).

A named fiduciary is one "named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly." 29 U.S.C. § 1102(a)(2). ERISA requires every plan to "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." *Id.* § 1102(a)(1).

A "person" is a functional fiduciary

> with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A); *Dawson-Murdock*, 931 F.3d at 276.

In determining whether an individual is a functional fiduciary, "the threshold question is . . . whether [the defendant] was acting as fiduciary, in that [he was] performing a fiduciary function[] when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000). *See also Coleman*, 969 F.2d at 61 (noting that if the "necessary discretionary authority" to render a party an ERISA fiduciary is not found in the plan documents' "formal allocation of responsibilities," the court "must also look beyond the formalities to see if [the party] in fact

9

exercised authority over" specified functions); *Custer*, 89 F.3d at 1161 (noting that ERISA fiduciaries include both named fiduciaries and "any individual[s] who *de facto* perform[] specified discretionary functions with respect to the management, assets, or administration of a plan").

The Fourth Circuit has repeatedly referred to a Department of Labor ("DOL") interpretive bulletin published in 1975 in determining whether a person or entity is an ERISA fiduciary. *See* 29 C.F.R. § 2509.75-8; *Dawson-Murdock*, 931 F.3d at 276 (citing *Custer*, 89 F.3d at 1162; *Coleman*, 969 F.2d at 61–62). The bulletin provides that "a person who performs purely ministerial functions" is not a fiduciary. Such ministerial functions include "appl[ying] . . . rules determining eligibility for participation or benefits," "advising participants of their rights and options under the plan," or "collect[ing] . . . contributions and appl[ying] . . . contributions as provided in the plan"—"within a framework of policies, interpretations, rules, practices and procedures made by other persons. . . ." 29 C.F.R. § 2509.75-8 (D-2). However, some positions "by their very nature require persons who hold them to perform one or more of the functions" described in ERISA's definition of a fiduciary. *Id.* (D-3). For example, a "plan administrator must, by the very nature of his position, have 'discretionary authority or discretionary responsibility in the administration' of the plan" and is therefore a fiduciary. *Id.* A corporate officer is not a plan fiduciary "solely by reason of holding such office or employment if he or she performs none of the functions described in" 29 U.S.C. § 1002(21)(A). *Id.* (D-5). Still, a corporate officer may be a fiduciary if she has discretionary authority or control over plan functions; the extent of that authority or control, however, limits her potential liability. *See Leigh v. Engle*, 727 F.2d 113, 133–35 (7th Cir. 1984) (finding that corporate officer and director was a fiduciary "with respect to the selection and retention of the plan administrator" and that he therefore "had a duty to monitor appropriately the administrators' actions" in managing the plan); *see also Anderson v. Ciba-Geigy Corp.*, 759 F.2d

1518, 1522 (11th Cir. 1985) (finding that "whatever his title, or whether he was named as a fiduciary or not," the defendant company executive acted as a fiduciary when he determined that the plaintiff employees were not entitled to severance pay under the terms of the plan).

Neither party argues or points to any evidence in the record showing that Melessa was the Plan administrator or other named fiduciary of the Plan.[2] Therefore, there is no genuine dispute that Melessa "was not the administrator of the Anthem plan" or a named fiduciary of the Plan. Dkts. 41 at 9; 54 at 3. Indeed, on a separate motion for summary judgment, this Court recently held that Canipe was Johnson's Plan administrator and thus a named fiduciary of the Plan. *See Hammer v. Johnson Senior Ctr., Inc.*, No. 6:19-cv-27, 2020 WL 7029160 at *7–8 (W.D. Va. Nov. 30, 2020).

Even so, if Melessa exercised any discretionary authority or control over the management of the Plan or its assets as described in 29 U.S.C. § 1002(21)(A)(i)—as Hammer argues she did—Melessa would be considered a fiduciary of the Plan to the extent of her authority or control over those functions. Thus, the issue is whether Melessa acted as a functional fiduciary of the Plan.

---

[2] Hammer has not made part of the record either the Plan instrument or any other governing documents, which must specify at least one named fiduciary under ERISA. *See* 29 U.S.C. § 1102(a)(2); *Dawson-Murdock*, 931 F.3d at 272 (finding Plan administrator and named fiduciary of Plan in the Summary Plan Description, and noting that this document and the Summary of Benefits "are integral to the ERISA claims" brought in that case). Generally, the court's review in an ERISA case is restricted to such documents in the administrative record, as well as limited extrinsic evidence known to the administrator at the time it rendered the challenged benefits coverage determination. *Helton v. AT&T Inc.*, 709 F.3d 343, 352–53 (4th Cir. 2013). However, "a breach of fiduciary duty claim that does not arise from interpretation of policy documents, but that concerns materials and events outside of the administrative review process should not be subject to the same discovery constraints as a typical denial of benefits claim." *Coffey v. Hartford Life & Accident Ins. Co.*, 318 F.R.D. 320, 323 (W.D. Va. 2017) (citing *Malbrough v. Kanawha Ins. Co.*, 943 F. Supp. 2d 684, 692–93 (W.D. La. 2013)). Because sources outside the administrative record—including the parties' depositions—contain information relevant to the breach of fiduciary duty claims brought here, the Court considers such evidence. *Id.* at 324.

Melessa argues that she was not a fiduciary of the Plan in any respect because she neither possessed nor exercised any discretionary authority or control regarding the Plan. Dkts. 41 at 8–13; 54 at 2–3. She contends that she "did not work regularly at the facility," Dkt. 41 at 9, and that she was "not involved" in paying the Anthem premiums, *id.* at 12. Melessa testified in her deposition that her responsibilities at Johnson revolved around coordinating patient care, since she has a medical background. Dkt. 41-2 at 9–10. She also testified that her positions as Vice President, Secretary, and Treasurer were symbolic titles and carried no real responsibilities. *Id.* at 9–11. In addition, she attested that she received no dividends or profits as an officer of Johnson, but instead received only a salary as an employee and rent payments as a co-owner. *Id.* at 12–13.

In contrast, Hammer contends that Melessa was a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A)(i) because she exercised some degree of authority over the disposition of the employee contributions to Plan premiums that Johnson withheld from Hammer's wages, which became Plan assets as of the earliest date that they could reasonably have been segregated from Johnson's general accounts. Dkt. 50 at 4–6. In her deposition testimony, Melessa attested to serving as Vice-President, Treasurer, Secretary, and co-owner of Johnson. Dkt. 41-2 at 8–9. Melessa also agreed that she was "pretty much running the show," *id.* at 9, and was the "day-to-day decision maker on the scene," *id.* at 21, after 2010. Hammer states that this testimony establishes that Melessa controlled Johnson's operations, including its participation in the Plan.

Hammer also argues that, according to Johnson's corporate documents, Melessa, as Treasurer, had "the care and custody of and [was] responsible for all the funds and securities of" Johnson and that her duties involved "sign[ing], mak[ing], and endors[ing] in the name of the Corporation, all checks, drafts, warrants and orders for the payment of money, and pay out and dispose of the same and receipt therefor . . . ." Dkt. 50-2 at 28. In Hammer's view, these documents

12

show that Melessa was responsible for Johnson's funds and Plan premium payments to Anthem. Because this responsibility constitutes authority over the management and disposition of employee contributions to Plan premiums that were withheld from Hammer's wages, Hammer contends that Melessa was a fiduciary of the Plan with respect to this function.

In addition, Hammer notes that Massie, who paid Johnson's Plan premiums to Anthem, testified in her deposition that she requested permission from Melessa when making decisions. Dkt. 41-1 at 7–8 ("Q: And what did Melessa do? A: Melessa was the owner, vice president, and, you know, when we had questions, we would go to her or Mike to ask questions, to get their permission to do things."). Massie also testified that she spoke with Melessa about Johnson's finances as well as her practice of paying the Anthem bill one month late. Dkt. 41-1 at 17–20; *see id.* at 20 ("Q: When you made the decision to pay that health-insurance bill a month late—within the grace period but a month late—did you talk that over with anybody, or did you make that decision yourself? A: I don't remember. I feel certain that Ashley and Melessa and I had conversations about it, but I don't remember specific conversations. I certainly didn't keep it a secret."). Hammer acknowledges that Massie's role in paying the Anthem bill and deciding when to do so does not make her a fiduciary, since an employee who performs ministerial tasks such as "collect[ing] . . . contributions and appl[ying] . . . contributions as provided in the plan" "within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary . . . ." 29 C.F.R. § 2509.75-8 (D-2). But Hammer argues that Melessa, as "a co-owner[] [who] held three important offices within Johnson[] and ran its daily operations," cannot escape liability as a fiduciary by deflecting responsibility for disposing of the Plan's assets onto Massie. Dkt. 50 at 6.

13

Viewing the evidence in the light most favorable to Hammer as the nonmoving party and drawing all reasonable inferences in her favor, as the Court must in ruling on a motion for summary judgment, the Court finds that the evidence in the record reveals genuine disputes of material fact regarding Melessa's responsibilities and role at Johnson. These disputes preclude the Court from finding that Melessa was not a fiduciary of the Plan under ERISA. Accordingly, the Court will deny Melessa's motion for summary judgment on Hammer's ERISA claims (Counts I through V).

To be sure, Melessa's positions as Vice President, Secretary, and Treasurer of Johnson did not "by their very nature" require her to act as an ERISA fiduciary of the Plan. 29 C.F.R. § 2509.75-8 (D-3). Nonetheless, Johnson's corporate documents charged Melessa, as Treasurer, with responsibility for all of Johnson's funds and granted her authority to write checks to pay business expenses, including health insurance premiums. Dkt. 50-2 at 28. And while Melessa testified in her deposition that her titles were merely symbolic and that she was not routinely present at Johnson, Hammer points to other evidence in the record—including an admission from Melessa and deposition testimony from Massie—that Melessa was the primary decisionmaker in charge of Johnson's day-to-day operations, Dkt. 41-2 at 9, 21, and that Massie requested permission from Melessa when making decisions, Dkt. 41-1 at 7–8. Finally, although Melessa testified that she did not know until this lawsuit was filed that Massie regularly paid the Plan premiums to Anthem just before the end of the grace period, Dkt. 41-2 at 27, other evidence is to the contrary. Massie testified that she "fe[lt] certain that" she "had conversations about" her practice of paying the premium to Anthem at the end of the grace period with Melessa. Dkt. 41-1 at 20. Melessa also testified that in 2018 she was aware of Johnson's "tight" finances, Dkt. 41-2 at 27, and that Johnson depended on direct deposits from Social Security, which arrived at the beginning of each month, to pay its bills, *id.* at 28–29.

Considering this evidence, a reasonable factfinder could conclude that Melessa (1) had responsibility for and authority over Johnson's funds, including withheld employee premium contributions and Plan premium payments, (2) was actually involved in managing Johnson's operations, including disbursement of its funds, and (3) knew about and at least tacitly condoned Johnson's practice of not segregating withheld employee premium contributions before making Plan premium payments to Anthem. Because a reasonable factfinder could find that Melessa exercised discretionary authority or control regarding the management or disposition of Plan assets, there is a genuine issue of material fact precluding judgment in favor of Melessa as a matter of law. Accordingly, the Court must deny Melessa's motion for summary judgment on Hammer's ERISA claims (Counts I through V).

However, the parties do not dispute that the September 27, 2018 termination letter stripped Melessa of any authority to act as an officer, employee, or agent of Johnson. Because Melessa had no discretionary authority or control with respect to the Plan or its assets after September 27, the Court concludes that Melessa was not a fiduciary after that date.

Because the Court cannot determine as a matter of law whether Melessa was an ERISA fiduciary before September 27, 2018—a prerequisite to liability for breach of ERISA fiduciary duties—and will deny summary judgment on that basis, the Court will not evaluate the parties' further arguments regarding breach of ERISA fiduciary duties.

### IV. HAMMER'S COMMON LAW CLAIMS (COUNTS VII & VIII)

Hammer also seeks to hold Melessa liable under state common law claims for conversion (Count VII) and breach of fiduciary duty (Count VIII). Dkt. 36. Because ERISA preempts these claims, they fail as a matter of law. Dkt. 41 at 18–19.[3] *See also Elmore v. Cone Mills Corp.*, 23

---

[3] Hammer does not address Melessa's arguments about these claims in her memorandum

F.3d 855, 863 (4th Cir. 1994) (finding that ERISA preempted state law claims, including for breach of fiduciary duty and negligence, relating to an ERISA-covered plan).

The Court evaluated these claims in its previous opinion in this case. *See Hammer*, 2020 WL 7029160 at *17. The Court incorporates the analysis and conclusions in that opinion and finds that Hammer's common law conversion claim (Count VII) and common law breach of fiduciary duty claim (Count VIII) fail as a matter of law.

## V. CONCLUSION

For these reasons, the Court finds that there is a genuine issue of material fact regarding Melessa's status as an ERISA fiduciary and that Melessa is not entitled to judgment as a matter of law. Accordingly, the Court denies summary judgment on Counts I through V. Because ERISA preempts Hammer's state common law conversion and breach of fiduciary duty claims, the Court awards summary judgment to Melessa on Counts VII and VIII.

An appropriate Order will issue.

The Clerk of Court is hereby directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered this 21st day of January, 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

in opposition. *See* Dkt. 50; *see also* Dkt. 54 at 2 ("Plaintiff's response does not address Melessa's argument that ERISA preempts the state law claims in Count VII (conversion) and VII (breach of fiduciary duty).").